71 P.3d 663 (2003)
117 Wash.App. 309
STATE of Washington, Respondent,
v.
Amy Jo McREYNOLDS, Appellant.
State of Washington, Respondent,
v.
Randy D. McReynolds, Appellant.
In the Matter of the Application for Relief from Personal Restraint of: Randy D. McReynolds, Petitioner.
In the Matter of the Application for Relief from Personal Restraint of: Amy Jo McReynolds, Petitioner.
No. 20863-0-III, 20887-7-III, 21222-0-III, 21240-8-III.
Court of Appeals of Washington, Division 3. Panel Nine.
June 10, 2003.
*665 David N. Gasch, Spokane, Anna K. Nordtvedt, Newport, for Appellants.
Allen C. Nielsen, Deputy Prosecuting Attorney, Colville, for Respondents.
John D. Blair-Loy, Washington Assoc. of Criminal Defense Lawyers, Spokane, for Amicus Curiae.
*664 KATO, A.C.J.
These consolidated appeals and personal restraint petitions renew the challenges by Randy D. McReynolds of his convictions and sentence on multiple counts of possession of stolen property and stolen firearms and unlawful possession of firearms, and by Amy Jo McReynolds of her convictions and sentence on multiple counts of possession of stolen property. The primary issues here are (1) whether the fifth of five search warrants was valid despite the invalidity of the first four; (2) whether a new trial is required because evidence obtained from the invalid warrants was admitted in the original trial; and (3) whether the multiple convictions for possession of stolen property violate the prohibition against double jeopardy. We reverse and remand for a new trial.
The facts of the case are explained in our decision in State v. McReynolds, 104 Wash. App. 560, 17 P.3d 608 (2000), review denied, 144 Wash.2d 1003, 29 P.3d 719 (2001). We held there that the first of five search warrants issued in the case was invalid and remanded to the trial court for additional findings on the question whether subsequently obtained evidence was tainted by the initial, unlawful search. Id. at 568-72, 17 P.3d 608. On remand, the State stipulated that Warrants 2, 3, and 4 were tainted by Warrant 1. However, the State contended that Warrant 5 remained untainted.
The trial court held that "[t]he taint of the unlawful search was attenuated, or dissipated such that it did not taint the evidence obtained [from a U-Haul truck under Warrant 5]." Randy Clerk's Papers (RCP) at 82; Amy Clerk's Papers (ACP) at 58. The court noted that Warrants 1 and 5 were four days apart and held they were "not in close temporal proximity." RCP at 82; ACP at 58. The court noted that both defendants' admissions were knowing and voluntary, two and three days after Warrant 1 was served, and that the officers' search of the McReynoldses' car was consensual. The court found the officers' conduct was not egregious, because they sought and received warrants, which only later were found to be unlawful, rather than conducting searches without authority.
Finally, the court held that "[a] number of meaningful intervening circumstances" occurred between Warrant 1 and the search of the U-Haul truck under Warrant 5:(1) an anonymous tip about the McReynoldses' use of a rented storage unit; (2) an interview with the owner of the storage unit; (3) an interview with the person who rented the Haul to Amy Jo McReynolds; (4) an interview with a man who lived on the same property as the McReynoldses; (5) the questioning of Amy Jo McReynolds and her subsequent consent to a search of her vehicle; (6) the arrest of Randy McReynolds; (7) the questioning of Randy McReynolds after his arrest; (8) the location of the U-Haul truck; and (9) interviews with two others who lived on the same property as the McReynoldses. RCP at 83; ACP at 59.
The court found that large portions of the officers' affidavit in support of Warrant 5 were tainted by the earlier searches, and it redacted them from the affidavit. The redacted affidavit provided:
On 12/09/07 a search warrant was served at 362 Aladdin Road, Colville. Residing at that location is Harold and Donna Sears who have rented the property, as well as their stepson Randy McReynolds and his wife Amy Jo along with 3 small children, Donna Sears brother Eugene *666 McReynolds and his wife Susan, Harold and Donna's son Jeff Sears, daughter Angie Moen with 2 kids and residing in a camper on the property was a Leonard Wolf, a friend of the family. Eugene McReynolds and Leonard Wolf were in custody in the Stevens County Jail at the time of the Search Warrant service, however Randy McReynolds had just bailed out of jail and had returned to the residence.
Harold and Donna Sears had advised the officers on the 9th that if they needed to return a Search Warrant for their residence and garage would not be necessary as they would give permission. Contact was made with Harold Sears and he was requested to come to the Sheriff's Office to discuss the ongoing investigation which he did. Det. Paramore and Capt. Webb also received information at the same time that Randy McReynolds had rented a storage unit, believed to be near the Auto View Drive Inn, between Colville and Kettle Falls, and further that he may be getting ready to leave the area this p.m., possibly in possession of stolen property.
Det. Paramore called the owner of the Storage Unit and asked if the McReynolds had in fact rented a unit at that location. Paramore was advised that Randy McReynold[s] had rented a unit, and further was advised that Randy McReynold[s] and his wife Amy Jo had been out to the unit on this date with a U-Haul truck and had cleaned it out, stating they were moving to Deer Park.
Det. Baskin called Tim Smith at Performance Motors and confirmed that Amy Jo McReynold[s] had in fact rented a 14' Diesel Ford U-Haul truck on this date, listing their destination as Toppenish, WA. Smith was requested to provide the license number on the vehicle as soon as he could obtain it, and subsequently notified Stevens County Dispatch that the license #was 1877BIndiana plate. Further descriptor information on the truck provided by Smith was that the truck number was 2746Z.
The day after the confrontation occurred, H. Sears advised that a man from the second hand store, located in Ferry County near Boyds had come to the residence with a horse trailer and bought items from R. McReynolds. When H. Sears was asked if R. McReynolds or Amy Jo McReynolds had rented a storage unit he advised the he didn't know, however the items had to go somewhere. He further advised that Eugene & Susan McReynolds shared J. Sears room due to the cramped living conditions in the house, however continued to state that he didn't know how the gun ended up under Jeff's mattress.
When asked about other family members living in the area, H. Sears advised that another daughter (sister of Randy McReynolds), Mindy and her husband Josh Shay lived just down the road from them. He further advised that when he left the residence to come and talk to us, that R. McReynolds was at the residence with Amy Jo, and they had arrived in their blue [O]ldsmobile, however Randy's pickup had been missing most of the day, and still was not at the residence.
Detective Caruso and Deputy M. George were sent to the residence to maintain surveillance and to attempt to locate the U-Haul truck identified as rented by them. Upon initially checking the area, both the car and the pickup appeared to be gone from the residence, and no U-Haul truck was observed, however while maintaining surveillance of the residence, both the pickup and car returned. Detective Caruso and Deputy George made contact with the people at the residence and interviewed Amy Jo McReynolds. McReynolds gave them permission to search the vehicle's [sic] which were registered to her, and further advised that her husband Randy was at the Hilltop Restaurant at Addy with the U-Haul truck and that "not all of the items in the truck were stolen, some of them were theirs". Amy Jo further advised that she had the key to the U-Haul truck and that it was the only key to the truck and that Randy was awaiting her return. Detective Caruso called Det. Paramore and advised him of the above statement and that there were 4 guns in the U-Haul and advised caution because the weapons were in an unknown location. Upon conducting the search of the vehicles, *667 registered to Amy Jo McReynolds specifically identified as an Oldsmobile, License # 850DYY and a Chevy pickup with Washington License # A80909A, items were seized which Amy Jo advised Detective Caruso and Deputy George did not belong to them.
Deputy's [sic] P. Murray and M. Foster were asked to respond to the Addy Hilltop Inn to attempt to locate the U-Haul truck in question as well as R. McReynolds. Upon arriving in the Addy area, Randy McReynolds was contacted and arrested by the officers walking just North of the Hilltop Inn, on S.R. 395.[T]he fact that R. McReynolds was leaving the area with a U-Haul truck which by his wife's own admission contained stolen property[.] The U-Haul truck with Indiana license plate # 1877B was located at the Hilltop Inn on the North side. Upon Det. Baskin reading R. McReynolds his rights, Randy advised that he loaded all of their stuff, and all of Lenny's (Wolf's) stuff in the truck. Det. Baskin asked him if it was stolen stuff, and he said "yes" he loaded all of the stolen stuff on the truck, because he didn't want to leave all of the stolen items scattered around the yard at the storage shed. The U-Haul truck was subsequently impounded at Davis Towing until a search warrant could be obtained. While at the scene of the U-Haul truck in Addy, Det. Baskin and Det. Paramore noted that the snow on the ground behind the U-Haul truck was packed down, and that there was bark on the ground behind the tracks and further that there was a small cylinder hone on the rear bumper.
Following R. McReynolds arrest, contact was made with his sister and brother-in-law, Mindy and Josh Shay. Mindy and Josh Shay revealed that earlier on this date, Randy McReynolds was at their residence. Josh Shay advised that R. McReynolds picked up items which he along with Eugene McReynolds and Leonard Wolf had been leaving at their place. Josh identified those items as being a large diesel heater, boat motor, meat grinder which he described as being large and weighing approx. 150 lbs, large battery charger and a Troy Bilt weed eater, further advising that he helped R. McReynolds load these items into R. McReynolds pickup. Josh further advised that they would frequently drop items off at night and leave them for 24 to 48 hours and then they would be gone. He further advised that he had been told by the subjects that they were stealing from and burglarizing places.
Amy Jo McReynolds was subsequently called at the Sears residence by Detective Caruso and requested if she would be willing to come to the Sheriff's office to talk with the officers as additional questions had come up. Amy Jo agreed to do so and subsequently arrived at the Sheriff's Office where she was interviewed by Det. Caruso and Deputy George. During the interview Det. Baskin asked her if they loaded any items from their pickup into the U-Haul truck at Addy. Amy Jo advised that her and Randy McReynolds had in fact moved a boat motor, meat grinder, diesel heater, weed wacker and a battery charger from the pickup into the U-Haul.
Also on this date the key to the U-Haul truck which had been turned over to Det. Caruso and Deputy George by Amy Jo McReynolds and subsequently given to Detective Paramore, was used to start the U-Haul truck when it was moved from Davis Towing to the Colville Police Department Evidence Building.
RCP at 89-93; ACP at 65-69.
The court held this information was sufficient to uphold Warrant 5.
The defendants moved for a new trial, contending that evidence presented at the trial had been discovered during execution of Warrants 1, 2, 3, and 4, which were invalid. The trial court declined to consider the motions, believing itself constrained by this court's decision in the first appeal.
On the basis of a slight recalculation, the court resentenced Randy McReynolds to 467 months in prison, 10 months less than the original sentence. The court noted that this sentence still was more than a standardrange sentence for first degree murder and reflected it was "draconian" and "illogical." Report of Proceedings (RP) at 178-79. The court declined to address Randy McReynolds' *668 constitutional challenges to the sentence.
We first address whether evidence contained in the affidavit in support of Warrant 5 was tainted by the earlier, unlawful searches. The ultimate issue here is whether the exclusionary rule requires suppression of all or some of the evidence presented to the jury, because it was discovered directly or indirectly as a result of Warrant 1 (which this court concluded was invalid) or Warrants 2, 3, 4, and 5. Not all evidence is "`fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "Rather, the more apt question in such a case is `whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of the primary illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. (quoting JOHN M. MAGUIRE, EVIDENCE OF GUILT, 221 (1959)); see McReynolds, 104 Wash.App. at 571, 17 P.3d 608.
The exclusionary rule requires courts to suppress evidence obtained through violation of a defendant's constitutional rights. The purpose of the rule is to deter police from exploiting their illegal conduct and to protect individual rights. Under the "fruit of the poisonous tree" doctrine, the exclusionary rule applies to evidence derived directly and indirectly from the illegal police conduct. Derivative evidence will be excluded unless it was not obtained by exploitation of the initial illegality or by means sufficiently distinguishable to be purged of the primary taint. To prove that the evidence was purged of taint, the State must show either that: (1) intervening circumstances have attenuated the link between the illegality and the evidence; (2) the evidence was discovered through a source independent from the illegality; or (3) the evidence would inevitably have been discovered through legitimate means.
State v. Tan Le, 103 Wash.App. 354, 360-61, 12 P.3d 653 (2000) (footnotes omitted). Factors to be considered in determining whether intervening circumstances attenuated the link between the original illegality and the evidence are: "(1) temporal proximity; (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." Id. at 362, 12 P.3d 653; see Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
Here, the State conceded on remand that Warrants 2, 3, and 4 were invalid, presumably because they resulted directly from evidence discovered during the execution of Warrant 1. The trial court thus considered on remand whether the exclusionary rule also rendered Warrant 5 invalid because its approval was based on evidence resulting from Warrants 1 through 4. See State v. Ludvik, 40 Wash.App. 257, 264, 698 P.2d 1064 (1985) (issue is whether, after excluding tainted evidence, affidavit establishes probable cause to uphold warrant).
The McReynoldses contend in part that the court erred in failing to conclude that all of the facts contained in the affidavit in support of Warrant 5 should have been suppressed. They disagree with the court's conclusion that the taint of the earlier, invalid searches was sufficiently attenuated that Warrant 5 was not invalid. As the McReynoldses point out, the affidavits supporting Warrants 4 and 5 were identical and were issued on the same day. The events thus were very close in time, and this factor favors exclusion of the evidence.[1]
However, as the trial court recognized on remand, the police conduct here was not flagrant.[2] For all of the searches, the officers *669 recognized the need for warrants and followed the constitutional process for obtaining approval. This factor supports the court's conclusion that Warrant 5 was sufficiently attenuated.
Also, several events intervened between the original, unlawful search and the officers' application for Warrant 5. The officers received a tip that Randy McReynolds had rented a storage unit. They later confirmed the tip with the owner, who also reported the McReynoldses were cleaning out the unit. They also learned the McReynoldses had rented a U-Haul truck. Harold Sears, who lived at the property with the McReynoldses, told officers that a man with a horse trailer had bought items from Randy McReynolds. Josh Shay, who lived nearby, told officers that Randy McReynolds stored stolen items on his property and had admitted participating in burglaries. Amy Jo McReynolds told officers that "not all of the items in the [U-Haul] truck were stolen" and consented to a search of a vehicle, which she admitted contained items that did not belong to her. RCP at 92; ACP at 68. After his arrest, Randy McReynolds himself admitted there was stolen property in the U-Haul truck. These events are meaningful investigative details that were not the direct result of the earlier unlawful searches.
The court thus properly evaluated the relevant factors and concluded that some of the material contained in the affidavit in support of Warrant 5 was not tainted.
The McReynoldses also contend the court erred in failing to redact facts from the affidavit in two specific areas. First, they contend that without Warrant 1 the officers could not have known where and with whom Randy McReynolds lived (and thus could not have obtained statements from them). However, the McReynoldses have failed to establish that this information was obtained by exploitation of the original invalid warrant. Eugene McReynolds and Leonard Wolf, who also lived on the property, were arrested at the scene of a burglary. And Randy McReynolds, who was stopped nearby, gave an address on Aladdin Road, where the property was located. Under these circumstances, discovery of the location of the property and the identities of other residents would have been inevitable.[3]See State v. Avila-Avina, 99 Wash.App. 9, 18, 991 P.2d 720 (2000).
Second, the McReynoldses point out that the trial court excised from the affidavit the information that Randy McReynolds was arrested for possession of a stolen firearm while he was walking away from the Hilltop Inn, where the U-Haul truck was located. The court's reasoning was that because the firearm had been recovered during an earlier, invalid search, that fact was inadmissible in the affidavit. In its written findings, however, the court stated that Randy McReynolds "was placed under arrest for possession of stolen property and possession of a stolen firearm[,] a shotgun (the Mossburg)." RCP at 80. This finding essentially is an implicit conclusion that Randy McReynolds' arrest was lawful, even though the firearm evidence was obtained unlawfully, because there was probable cause at the time to arrest him for possession of stolen property. It is not necessary to address this conclusion because, as we conclude below, the affidavit established probable cause to search the U-Haul truck even without Randy McReynolds' postarrest statement.
The court properly concluded that some, but not all, of the evidence contained in the affidavit in support of Warrant 5 was admissible.
We next address whether the redacted affidavit in support of Warrant 5 established probable cause to search the U-Haul truck. A court may issue a search warrant only on probable cause. State v. Thein, 138 Wash.2d 133, 140, 977 P.2d 582 (1999). "Probable cause exists if the affidavit in support *670 of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched." Id. Affidavits are viewed in a commonsense, not hypertechnical manner. State v. Partin, 88 Wash.2d 899, 904, 567 P.2d 1136 (1977).
Even excluding Randy McReynolds' statement after his arrest, the redacted affidavit contains ample evidence to support a determination of probable cause. Amy Jo McReynolds herself admitted that the truck contained stolen property and that she had the key to it. She later told officers she and Randy McReynolds had loaded various stolen items into the truck. Josh Shay told officers that Randy McReynolds had admitted participating in burglaries. This evidence supports the court's determination that the redacted affidavit established probable cause that the McReynoldses possessed stolen property and that evidence of that crime was contained in the U-Haul truck.
We next address the defendants' motion for a new trial. Failure to suppress evidence obtained in violation of a defendant's Fourth Amendment rights is constitutional error and is presumed to be prejudicial. Tan Le, 103 Wash.App. at 367, 12 P.3d 653. The State bears the burden of demonstrating the error is harmless. Id. Constitutional error is harmless only if the State shows beyond a reasonable doubt that any reasonable jury would have reached the same result without the error. State v. Brown, 147 Wash.2d 330, 341, 58 P.3d 889 (2002).
The State urges us to find the court's failure to suppress the evidence harmless, pointing out that the search warrants themselves were not introduced as evidence at trial, and only one trial exhibit (a shotgun) was obtained as a result of Warrants 1, 2, or 3. It further points out that that single exhibit was not the basis of any charge against Amy Jo McReynolds, and Randy McReynolds was acquitted of the charge related to it. However, this argument ignores the fact that witnesses at trial testified at length about the unlawful searches and what items were found. The State argues there was only "limited" testimony about the searches authorized by the invalid warrants, but it does not address the constitutional harmless error standard. Under these circumstances, the State has failed to demonstrate beyond a reasonable doubt that any reasonable jury would have convicted the defendants here. A new trial is required.
We next address the McReynoldses' pro se argument that officers unlawfully seized Amy Jo McReynolds.[4] After a pretrial hearing, the superior court found:
A. UNDISPUTED FACTS
1. Pursuant to an ongoing investigation involving charges of burglary and possession of stolen property, the Stevens County Sheriff's Office detailed officers Mike George and Jim Caruso to the area of the Sears-McReynolds home on December 10, 1997.
2. The officers were looking for a U-Haul truck that might contain stolen property and for Randy McReynolds. They arrived in the vicinity on Aladdin Road about 1800 hours. It was dark.
3. The temperature was slightly below freezing. The officers waited a few minutes and then saw two vehicles approach and park in the driveway. They drove up and parked behind the vehicles. The driver of the pickup truck was Amy McReynolds.
4. Officers Caruso and George questioned Ms. McReynolds beside her vehicle in the driveway. She had not been consuming alcohol or drugs. She was wearing light clothing, but in a few minutes Donna Sears brought her a jacket and, later, some heavy coveralls to stand on so her feet would not get cold. Ms. McReynolds remained outside for one and one-half to two hours while the officers were present. *671 She talked briefly to Ms. Sears. She was not permitted to leave the scene.
5. Ms. McReynolds executed a written permission to search the two vehicles (pickup truck and Oldsmobile sedan) that she and Susan McReynolds drove to the residence.... She was orally advised of her Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ] rights by Officer George soon after questioning began. Later she gave a written statement to the officers which was in her handwriting and executed in the driveway....
6. When the officers left the Sears-McReynolds residence they returned to the Sheriff's Office. They then called Ms. McReynolds and asked her to come there to talk to them further because some aspects of her statement seemed inconsistent. She agreed to come to the office and did so. She gave a further statement.
. . . .
C. FINDINGS AS TO DISPUTED FACTS
1. The officers did not keep Ms. McReynolds outside in the cold intentionally to overcome her will. The temperature was slightly below freezing. Ms. McReynolds was provided with a jacket and something to stand on by Ms. Sears. While it may have been inconvenient to stand outside while talking to the officers, while they searched the vehicles, and while she made a written statement, there was no misconduct by the police in having her do so.
2. The officers did not use threats or foul language to pressure Ms. McReynolds into giving a statement, either at the Aladdin residence or later at the Sheriff's office. Ms. McReynolds did ask what would happen to her children in the event she was arrested and the officers told her Child Protective Services would have to be called but that was in response to a question, not a threat. Ms. McReynolds arranged her own transportation when she came to the Sheriff's Office later and she gave further information as to how [the] U-Haul truck had been rented, how it was paid for, how and when it was loaded, etc. She was not arrested.
3. After Ms. McReynolds was orally advised of her rights she initially indicated she did not desire to talk to the officers. She did not request an attorney but she did talk to Donna Sears when Ms. Sears came out of the house at about this time. After talking to Ms. Sears, Ms. McReynolds indicated she would be willing to talk to the officers and she did so. She then signed the consent to search form for the vehicles and advised the officers that Mr. McReynolds and the U-Haul truck were located at the restaurant in Addy, Washington. The officers did not violate Ms. McReynolds['] rights in the questioning process.
4. Ms. McReynolds was orally re-advised of her rights under Miranda when she arrived at the Stevens County Sheriff's Office later on the evening of December 10, 1997.
McReynolds, 104 Wash.App. at 573-75, 17 P.3d 608. These findings are supported by substantial evidence. Id. at 576, 17 P.3d 608.
The McReynoldses first contend the officers did not have a lawful reason to stop and detain Amy Jo McReynolds on December 10, 1997. Both the Fourth Amendment and article I, section 7 of the Washington Constitution require that any such seizure be reasonable. State v. Ellwood, 52 Wash.App. 70, 73, 757 P.2d 547 (1988). This determination is subject to de novo review. Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); see State v. Hoffman, 116 Wash.2d 51, 97-98, 804 P.2d 577 (1991), aff'd sub nom. McGinnis v. Blodgett, 67 F.3d 307 (1995), cert. denied, 516 U.S. 1160, 116 S.Ct. 1046, 134 L.Ed.2d 192 (1996).
Even when officers lack probable cause to arrest, they may be permitted to "stop a suspected person, identify themselves, and ask that person for identification and an explanation of his or her activities." State v. White, 97 Wash.2d 92, 105, 640 P.2d 1061 (1982); see Terry v. Ohio, 392 U.S. 1, 25-26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Terry permits officers to detain a person briefly if he reasonably suspects the person of criminal activity. State v. Watkins, 76 Wash.App. *672 726, 729, 887 P.2d 492 (1995) (citing State v. Rice, 59 Wash.App. 23, 26, 795 P.2d 739 (1990)). A Terry stop must be based on "a well founded suspicion based on objective facts that [the person] is connected to actual or potential criminal activity." State v. Sieler, 95 Wash.2d 43, 46, 621 P.2d 1272 (1980).
At the time of the detention, the officers knew that Randy and Amy Jo McReynolds lived at the same property where Eugene McReynolds and Leonard Wolf were staying. Eugene McReynolds and Leonard Wolf had been arrested two days earlier at the site of a burglary; Randy McReynolds was stopped within shouting distance nearby. Randy and Amy Jo McReynolds were renting a storage unit, the contents of which they had put into the U-Haul truck the day after the arrests. Also, Harold Sears told officers that two weeks earlier Randy McReynolds had sold a trailer full of items to a second-hand dealer. These facts created a reasonable suspicion that Randy McReynolds had possession of stolen property. The fact that Amy Jo McReynolds helped her husband empty the storage unit created a reasonable suspicion that she also participated in the crime. The officers had a lawful basis for detaining Amy Jo McReynolds.
The McReynoldses also contend the seizure exceeded the scope of a lawful Terry stop. To the extent they again allege the officers were unduly aggressive, threatening, and abusive during the interview, "the [superior] court's findings directly or implicitly rejected this evidence and accepted the officers' accounts of the incident." McReynolds, 104 Wash.App. at 575-76, 17 P.3d 608. And to the extent they allege the detention evolved into a full-scale custodial arrest, the answer is that during the interview Amy Jo McReynolds (1) admitted that "not all of the items in the truck were stolen," RCP at 80; ACP at 56, implying some of the items were stolen; (2) admitted she had the only key to the U-Haul truck, demonstrating her dominion and control over the truck and its contents; and (3) consented to a search of the vehicle she was driving, where officers found items she admitted she did not own. These additional facts provided probable cause that Amy Jo McReynolds possessed stolen property and justified the custodial arrest. The detention and arrest were lawful.
We next address the McReynoldses' pro se contention that the trial court failed to comply with this court's order on remand. During pretrial hearings in 1998, the superior court had determined that Warrants 4 and 5 were valid, even without considering the statements of Josh and Mindy Shays. There thus was no need for the court to address whether an officer deliberately or recklessly omitted from the affidavit the fact that he had shredded an earlier written statement by the Shayses. On remand, the court concluded the statements may be necessary to establish probable cause and conducted a Franks[5] hearing on the issue. The McReynoldses object to the court's decision to conduct the Franks hearing, but the issue clearly related to this court's order on remand to determine whether evidence obtained as a result of Warrant 1 tainted any other evidence in the case (including whether the affidavit in support of Warrant 5, purged of all tainted evidence, established probable cause to search the U-Haul truck). The superior court's decision to conduct a Franks hearing did not violate this court's remand order.
Noting that the affidavits in support of Warrants 4 and 5 were identical,[6] the McReynoldses also contend the court improperly added facts to the affidavit supporting Warrant 5 to distinguish it from the affidavit supporting Warrant 4 (which the State had conceded was tainted by the original search). The McReynoldses contend some of these added facts earlier had been suppressed and others were from the Franks hearing, but they do not cite to the record; *673 we thus find it impossible to evaluate this portion of their argument. The McReynoldses also point out that the court held that the magistrate considering the affidavit in support of Warrant 5 had in mind other general knowledge about the earlier events:
The case [has been] remanded for determination of this factual question. And to me, counsel, what that means is [Warrants] 1, 2, 3 and 4 are all gone. I mean they're just gone. But the information that preceded the beginning of the whole thing, the arrest, the people that were arrested, where they lived, ... they are there as much as they ever were in my mind.
RP at 74.
The McReynoldses apparently contend the analysis of the application for Warrant 5 must be limited to the four corners of the officers' affidavit. However, CrR 2.3(c) implicitly permits consideration of facts extrinsic to the affidavit. See State v. Jansen, 15 Wash.App. 348, 350, 549 P.2d 32, review denied, 87 Wash.2d 1015 (1976); see also State v. Gonzalez, 77 Wash.App. 479, 891 P.2d 743 (1995), review denied, 128 Wash.2d 1008, 910 P.2d 481 (1996). In light of the requirement that warrant applications be evaluated in a commonsense manner, Partin, 88 Wash.2d at 904, 567 P.2d 1136, the court here properly considered the application for Warrant 5 in light of all of the events of the case, within the previous four days, that had not been tainted by the earlier improper searches.
We next address the McReynoldses' contention in their personal restraint petitions that their multiple convictions for possession of stolen property violated the constitutional bar against double jeopardy. The following table shows Randy McReynolds' convictions for stolen property, the date of the crimes, and the property involved:

Count Crime Date Property (owner)
1 First degree possession of stolen December Various tools (David H. Anderson
 property 1-15, and Dave Anderson Construction)
 1997
2 Second degree possession of stolen December Various tools (Ron Anderson and Ron
 property 1-15, Anderson Construction)
 1997
3 First degree possession of stolen December Various hand and power tools, horse
 property 1-15, equipment and tack, fishing gear,
 1997 camera equipment, and other personal
 property (Craig Lundberg)
4 Second degree possession of stolen December VCRs, various tools, and other personal
 property 1-15, property (Art Rutledge) 1997
5 Second degree possession of stolen December Household equipment, various tools,
 property 1-15, car equipment, and other personal
 1997 property (Walt Dimshaw)
6 Second degree possession of stolen December Various household equipment, tools,
 property 1-15, and other personal property
 1997 (Gaston LaRouche)
7 First degree possession of stolen December Various household furniture and
 property 1-15, furnishings, a Whirlpool stacking
 1997 washer/dryer, stereo equipment,
 fishing tackle, hunting equipment,
 metal detector, scuba equipment,
 tools, and other personal property
 (William Hill)
8 Second degree possession of stolen December Various tools, cemetery equipment,
 property 1-15, and other personal property
 1997 (Mountain View Cemetery and Joe
 Welsh)

*674
9 Second degree possession of stolen December Various hand and power tools and
 property 1-15, other personal property (Robert
 1997 and Mabel Lawrence)
10 Second degree possession of stolen December Various hand and power tools, radio
 property 1-15, equipment, automobile equipment,
 1997 welding equipment, and other personal
 property (Earth Construction
 and Jeff MacArthur)
11 Second degree possession of stolen December Yamaha boat motor (Ed Allan)
 property 1-15,
 1997
RCP at 1-6.

The following table shows Amy Jo McReynolds' convictions for stolen property, the date of the crimes, and the property involved:

Count Crime Date Property (owner)
1 First degree possession of stolen December Various tools (David H. Anderson
 property 1-15, and Dave Anderson Construction)
 1997
3 First degree possession of stolen December Various hand and power tools, horse
 property 1-15, equipment and tack, fishing gear,
 1997 camera equipment, and other personal
 property (Craig Lundberg)
4 Second degree possession of stolen December VCRs, various tools, and other personal
 property 1-15, property (Art Rutledge)
 1997
5 Second degree possession of stolen December Household equipment, various tools,
 property 1-15, car equipment, and other personal
 1997 property (Walt Dimshaw)
6 Second degree possession of stolen December Various household equipment, tools,
 property 1-15, and other personal property
 1997 (Gaston LaRouche)
7 First degree possession of stolen December Various household furniture and
 property 1-15, furnishings, a Whirlpool stacking
 1997 washer/dryer, stereo equipment,
 carpet cleaning equipment, a
 bicycle, tools, and other personal
 property (William Hill)
9 Second degree possession of stolen December Various hand and power tools and
 property 1-15, other personal property (Robert
 1997 and Mabel Lawrence)
11 Second degree possession of stolen December Yamaha boat motor (Ed Allan)
 property 1-15,
 1997
ACP at 1-6.

Both the Fifth Amendment and article I, section 9 of the Washington Constitution protect against multiple punishments for the same offense. State v. Adel, 136 Wash.2d 629, 632, 965 P.2d 1072 (1998). When a defendant is convicted of violating one statute multiple times,
[t]he proper inquiry ... is what "unit of prosecution" has the Legislature intended as the punishable act under the specific criminal statute. See Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955); State v. Mason, 31 Wash.App. 680, 685-87, 644 P.2d 710 (1982). The Legislature has the power, limited by the Eighth Amendment, to define criminal conduct and set out the appropriate punishment for that conduct.
Bell, 349 U.S. at 82, 75 S.Ct. 620. The proper question for this case is what act or course of conduct has the Legislature defined *675 as the punishable act for simple possession of a controlled substance? When the Legislature defines the scope of a criminal act (the unit of prosecution), double jeopardy protects a defendant from being convicted twice under the same statute for committing just one unit of the crime. See Bell, 349 U.S. at 83-84, 75 S.Ct. 620 (double jeopardy violated when defendant convicted on two counts of transporting women across state lines when two women were transported at the same time); In re Snow, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 (1887) (double jeopardy violated when defendant convicted on multiple counts of plural cohabitation when the cohabitation was continuous and ongoing). The unit of prosecution issue is unique in this aspect: While the issue is one of constitutional magnitude on double jeopardy grounds, the issue ultimately revolves around a question of statutory interpretation and legislative intent. See Peter Westen & Richard Drubel, Toward a General Theory of Double Jeopardy, 1978 Sup. Ct. Rev. 81, 113; Note, Twice in Jeopardy, 75 Yale L.J. 262, 313 (1965).
If the Legislature has failed to denote the unit of prosecution in a criminal statute, the United States Supreme Court has declared the ambiguity should be construed in favor of lenity. Bell, 349 U.S. at 84, 75 S.Ct. 620 ("[I]f Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses ...."); see also United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-22, 73 S.Ct. 227, 97 L.Ed. 260 (1952). The United States Supreme Court has been especially vigilant of overzealous prosecutors seeking multiple convictions based upon spurious distinctions between the charges. Brown v. Ohio, 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) ("The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units."); Snow, 120 U.S. at 282, 7 S.Ct. 556 (if prosecutors were allowed arbitrarily to divide up ongoing criminal conduct into separate time periods to support separate charges, such division could be done ad infinitum, resulting in hundreds of charges).
Adel, 136 Wash.2d at 634-35, 965 P.2d 1072.
The McReynoldses were charged and convicted of multiple counts of first and second degree possession of stolen property. Possession of stolen property is defined as:
knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto.
RCW 9A.56.140(1). The value of the property possessed determines the degree of the crime.[7] RCW 9A.56.150-.170. However, the definition applies to all degrees of the crime, so the unit of prosecution remains the same. See State v. Tili, 139 Wash.2d 107, 113, 985 P.2d 365 (1999) ("The parallel construction of [rape] statutes dictates that the `unit of prosecution' for rape remains the same from one degree to the next.").
It has long been the rule in Washington that the identity of the property's owner is not an element of crimes involving larceny or theft.[8]State v. Lee, 128 Wash.2d 151, 158-59, 904 P.2d 1143 (1995); State v. Easton, 69 Wash.2d 965, 967-68, 422 P.2d 7 (1966); State v. Kruger, 145 Wash. 654, 655, 261 P. 383 (1927). In State v. Martin, 94 Wash. 313, 317-18, 162 P. 356 (1917), the Supreme Court applied the rule to the crime of receiving stolen property. The rule thus also applies to the modern crime of possessing stolen property. See State v. Tresenriter, 101 Wash.App. 486, 495, 4 P.3d 145 (2000), 14 P.3d 788 (2000) (what property *676 was, where it was located, and connection with specific theft or burglary are not elements of crime of possession of stolen property), review denied, 143 Wash.2d 1010, 21 P.3d 292 (2001).
A logical consequence of this rule is that possession of property owned by different persons is only a single crime:
"We recognize no good reason to depart from what may be considered the great current of authority and hold the pleading in question bad, when it can reasonably be said that it discloses that the larceny complained of was but a single act or transaction in violation of the law against larceny, although the property which was the subject of the crime belonged to several different persons. The particular ownership as charged in the pleading, of the money stolen did not give character to the act of stealing it, but was merely a part of the description of the particular crime charged to have been committed. The information, prima facie, under the circumstances, can be said to charge but one offense against the state, and is not open to the objection that it is bad for duplicity."
State v. Makovsky, 67 Wash. 7, 8-9, 120 P. 513 (1912) (quoting Furnace v. State, 153 Ind. 93, 54 N.E. 441 (1899)).[9]
The critical question here is whether this rule survived the enactment of Washington's current statutory scheme in 1975. See LAWS OF 1975, 1st Ex.Sess., ch. 260. In adopting RCW 9A.56.140, the Legislature "essentially incorporated" the prior statute's provision governing possession of stolen property, former RCW 9.54.010(5) (LAWS OF 1915, ch. 165, § 3). State v. Richards, 27 Wash.App. 703, 705-06, 621 P.2d 165 (1980), review denied, 95 Wash.2d 1008 (1981). The Legislature "is presumed to be familiar with judicial interpretations of statutes, and absent an indication it intended to overrule a particular interpretation, amendments are presumed to be consistent with previous judicial decisions." State v. Bobic, 140 Wash.2d 250, 264, 996 P.2d 610 (2000).
The State contends the Legislature has provided two indications that it intended to overrule Makovsky and other decisions involving the crime of possession of stolen property. It relies first on RCW 9A.56.010(18), which provides in pertinent part:
Value. (a) "Value" means the market value of the property or services at the time and in the approximate area of the criminal act.
. . . .
(c) Whenever any series of transactions which constitute theft, would, when considered separately, constitute theft in the third degree because of value, and said series of transactions are a part of a criminal episode or a common scheme or plan, then the transactions may be aggregated in one count and the sum of the value of all said transactions shall be the value considered in determining the degree of theft involved.
For purposes of this subsection, "criminal episode" means a series of thefts committed by the same person from one or more mercantile establishments on three or more occasions within a five-day period.
(d) Whenever any person is charged with possessing stolen property and such person has unlawfully in his possession at the same time the stolen property of more than one person, then the stolen property possessed may be aggregated in one count and the sum of the value of all said stolen property shall be the value considered in determining the degree of theft involved.
The State reasons that, if separate counts were not permitted based on different ownership of property, there would be no reason in subsection (d) to permit it to aggregate the stolen property. The State made a similar argument in State v. Turner, 102 Wash.App. 202, 6 P.3d 1226 (2000), review denied, 143 Wash.2d 1009, 21 P.3d 290 (2001), in which the defendant was charged with three separate thefts by different methods over the same period of time from the same person. In Turner, the State relied on subsection (c). In response to the State's argument that this *677 statute permitted a prosecutor to define the unit of prosecution, the court held:
We read the statute to vest discretion in the prosecutor to increase the degree of the theft charge, not to define what the Legislature intended as the punishable act of first degree theft. The State's argument confuses the critical distinction between a prosecutor exercising discretion to aggregate third degree thefts to either a first or second degree theft charge and the Legislature's intent in defining the punishable act. We note that the unit of prosecution analysis is designed in part to avoid overzealous charging by the prosecution.... We seriously doubt that the Legislature could have intended to delegate to the prosecution the discretion to define the punishable act in this way.
Turner, 102 Wash.App. at 210, 6 P.3d 1226 (footnotes omitted).
Similarly here, subsection (d) gives the prosecutor discretion to aggregate separate possessions of stolen property to increase the degree of the charge. It does not define what the Legislature intended as the punishable act of possession of stolen property.
The State's confusion here may be because of the different types of acts identified in RCW 9A.56.140. The definition includes some identifiably discrete acts (receive, conceal, and dispose) and other acts that identify a course of conduct (possess and retain). See Blockburger v. United States, 284 U.S. 299, 302, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (distinguishing between selling and engaging in the business of selling). In Tili, 139 Wash.2d at 117, 985 P.2d 365, the Supreme Court held that individual acts of penetration constituted separate rapes or units of prosecution because they were not a continuous course of conduct. Conversely, when a statute defines a crime as a course of conduct over a period of time, "then it is a continuous offense and any conviction or acquittal based on a portion of that course of action will bar prosecution on the remainder." Harrell v. Israel, 478 F.Supp. 752, 754-55 (E.D.Wis.1979); see Sanchez v. State, 97 N.M. 445, 446, 640 P.2d 1325 (1982) ("The simultaneous possession of stolen items owned by different individuals is a single act constituting one offense."); State v. Goins, 705 S.W.2d 648, 651 (Tenn.1986) ("A defendant may be indicted and convicted only for as many counts of receiving or concealing stolen goods as evidence shows there are separate transactions of receiving or concealing particular goods. Otherwise, the simultaneous possession of goods stolen from more than one person is only one offense."); State v. Bair, 671 P.2d 203, 208 (Utah 1983) ("`[R]etaining' the stolen property of different individuals is but a single act and must be prosecuted as only one offense if the evidence shows ... that the retention or possession of such stolen property was simultaneous."); State v. Hall, 171 W.Va. 212, 223, 298 S.E.2d 246 (1982) ("Many articles stolen at different times from several persons may be received and concealed by the same act, and then there is but one offense.").
This distinction explains the reason for RCW 9A.56.010(18)(d). Separate, discrete possessions constitute separate units of prosecution, but the statute permits prosecutors to aggregate these units into a single count to prosecute a higher degree of the crime. The provision does not impliedly permit the State to divide a continuous course of conduct into separate, discrete units of prosecution.
The State also relies on RCW 9.94A.589(1)(a), which provides for concurrent sentences for offenses that encompass the same criminal conduct. "`Same criminal conduct' ... means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a) (emphasis added). In State v. Haddock, 141 Wash.2d 103, 110-11, 3 P.3d 733 (2000), the Supreme Court held that for the purpose of the Sentencing Reform Act of 1981(SRA), the victim of the offense of possession of stolen property is the property's owner.
The State reasons that the SRA's recognition of separate victims of the offense indicates the Legislature intended to authorize a separate unit of prosecution for each owner of stolen property. This extrapolation of the term "victim" to the unit-of-prosecution analysis is unfounded. The term has a specific meaning under the SRA, see RCW *678 9.94A.030(44), and its meaning extends beyond the immediate victim of a crime. State v. Davison, 116 Wash.2d 917, 920-21, 809 P.2d 1374 (1991). The definition has no bearing outside the confines of the SRA.
Here, the State charged the McReynoldses with continuous possession of various property during a period of 15 days. The unit of prosecution thus is a single possession. The separate convictions for the single possession violated the prohibition against double jeopardy.[10]
We now address the remaining issues raised in Randy McReynolds' personal restraint petition. The first is whether a provision of Hard Time for Armed Crime Act violates article II, section 19 of the Washington Constitution, which provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title." This single-subject provision prevents "`logrolling,' or pushing legislation through by attaching it to other necessary or desirable legislation," and gives general notice to the Legislature and the public of what is contained in the legislation. State v. Thorne, 129 Wash.2d 736, 757, 921 P.2d 514 (1996); see State v. Broadaway, 133 Wash.2d 118, 124, 942 P.2d 363 (1997).
Randy McReynolds here challenges his convictions under RCW 9A.56.310, a provision of Initiative 159 (the Hard Time for Armed Crime Act, hereafter the Act) which the Legislature enacted in 1995. See Broadaway, 133 Wash.2d at 124, 942 P.2d 363. The legislative title of the Act is "AN ACT Relating to increasing penalties for armed crimes ...." LAWS OF 1995, ch. 129; see Broadaway, 133 Wash.2d at 124-26, 942 P.2d 363. This is a restrictive title that "carves out an area of criminal offenses, armed crime, and limits its scope to increasing penalties for armed crime." Id. at 127-28, 942 P.2d 363.
In Broadaway, the Supreme Court upheld the sentencing enhancement provisions of the Act, but it specifically declined to address the Act's other provisions. Id. at 129, 942 P.2d 363.
Randy McReynolds contends in part that RCW 9A.56.310 violates the single-subject provision because it criminalizes constructive possession, which he contends is beyond the scope of the term "armed crime," as used in the Act's title. Because the Act itself does not define the term, he relies primarily on its declaration of policy and intent, which refers repeatedly to "carrying and use" of deadly weapons. LAWS OF 1995, ch. 129, § 1. He reasons that to carry or use a firearm, a person must be in actual, not constructive, possession of it.
Possession may be actual or constructive, and constructive possession can be established by showing the defendant had dominion and control over the firearm or over the premises where the firearm was found. See State v. Staley, 123 Wash.2d 794, 798, 872 P.2d 502 (1994); State v. Callahan, 77 Wash.2d 27, 29-30, 459 P.2d 400 (1969). The ability to reduce an object to actual possession is an aspect of dominion and control. State v. Hagen, 55 Wash. App. 494, 499, 781 P.2d 892 (1989).
State v. Echeverria, 85 Wash.App. 777, 783, 934 P.2d 1214 (1997).
Implicit in Randy McReynolds' argument is his assertion that constructive possession of a firearm does not pose the type of threat to the public that actual possession does, and thus is not encompassed in the phrase "armed crime." But because constructive possession requires the ability to reduce the firearm to actual possession, constructive possession of a firearm does pose the same type of risk. Therefore, the term "armed crime" (even when limited by the phrase "carrying and use") logically encompasses the constructive possession of a firearm.
Randy McReynolds also contends the title's phrase "increasing penalties for armed crimes" does not encompass the creation of a new criminal offense, possession of a stolen firearm, pursuant to RCW 9A.56.310. The premise of his argument is incorrect, because possession of a stolen firearm was a criminal *679 offense even before the Act was adopted. Before 1994, possessing a stolen firearm would have been prosecuted as second degree possession of stolen property. See former RCW 9A.56.160(1)(e) (LAWS OF 1987, ch. 140, § 4) ("A person is guilty of possessing stolen property in the second degree if... [h]e possesses a stolen firearm."). In 1994, the Legislature deleted this subsection, see LAWS OF 1994, 1st Sp. Sess., ch. 7, § 434, and created a new provision, former RCW 9A.56.300 (LAWS OF 1994, 1st Sp. Sess., ch. 7, § 432) ("A person is guilty of theft of a firearm if the person ... [p]ossesses, sells, or delivers a stolen firearm."). The Act thus did not create a new criminal offense, but merely recodified an offense that already had existed in various forms.
Randy McReynolds has failed to demonstrate that RCW 9A.56.310 violates the Constitution's single-subject provision.
Randy McReynolds also contends the court erred in imposing consecutive sentences for each of the firearms convictions. RCW 9.41.040(6) provides in pertinent part:
Notwithstanding any other law, if the offender is convicted under this section for unlawful possession of a firearm in the first or second degree and for the felony crimes of theft of a firearm or possession of a stolen firearm, or both, then the offender shall serve consecutive sentences for each of the felony crimes of conviction listed in this subsection.[[11]]
This provision clearly and unambiguously prohibits concurrent sentences for the listed firearms crimes. State v. Murphy, 98 Wash. App. 42, 48-49, 988 P.2d 1018 (1999), review denied, 140 Wash.2d 1018, 5 P.3d 10 (2000). Although Randy McReynolds urges the court to apply various rules of statutory construction, there is no need for such an analysis because the statute is unambiguous. See State v. Smith, 117 Wash.2d 263, 814 P.2d 652 (1991). Other cases on which Randy McReynolds relies are not applicable because they did not interpret the statutory language quoted above. See State v. Haddock, 141 Wash.2d 103, 3 P.3d 733 (2000); State v. Simonson, 91 Wash.App. 874, 960 P.2d 955 (1998), review denied, 137 Wash.2d 1016, 978 P.2d 1098 (1999).
Randy McReynolds has failed to show that the sentencing court erred in imposing consecutive sentences for each of the firearms convictions.
This conclusion also disposes of Randy McReynolds' contention that the consecutive sentences for the firearms convictions violated the ex post facto clauses of the state and federal constitutions. See U.S. CONST. art. I, § 9; WASH. CONST. art. I, § 20. The lynchpin of Randy McReynolds' argument is that the consecutive sentences were improper under RCW 9.41.040(6). Because this provision was in effect at the time of the offenses, there was no ex post facto violation.[12]
The convictions are reversed, and the case is remanded. If the State chooses to retry the McReynoldses as charged in the informations, each may be convicted of only one count of possession of stolen property.
SWEENEY, and KURTZ, JJ., concur.
NOTES
[1] In evaluating the "temporal proximity" factor, the court considered only the time between Warrants 1 and 5, even though Warrants 2, 3, and 4 also were invalid. Even if the court's approach were correct, the mere four-day gap between Warrants 1 and 5 is not sufficient to support attenuation.
[2] The McReynoldses resurrect their contentions regarding what they call the officers' misconduct in execution of one or more of the warrants. We addressed these contentions in McReynolds, 104 Wash.App. at 579, 17 P.3d 608, holding the defendants' allegations, even if true, did not establish misconduct. Moreover, the conduct at issue here is not the execution of the warrants, but rather the officers' applications for the warrants.
[3] Randy McReynolds points out that the trial court expressly found that the State had failed to prove facts establishing that any of the evidence was subject to the inevitable discovery rule. However, the finding relates only to evidence "that the U-Haul and stolen property would have been discovered from an untainted source." RCP at 83; ACP at 59. The finding clearly does not encompass the location of the property and the identities of its residents.
[4] The McReynoldses did not raise this issue at trial, in their original appeal, or on remand. In general, an appellate court will not consider an issue raised for the first time on review. RAP 2.5(a). However, a party who failed to object to the court below may assert a "manifest error affecting a constitutional right." RAP 2.5(a)(3).
[5] Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).
[6] The McReynoldses also reason that because the affidavits supporting Warrants 4 and 5 were identical and because the State conceded Warrant 4 was invalid, Warrant 5 also should be invalid. However, an affidavit may establish probable cause to search one location but not another. See generally Thein, 138 Wash.2d at 140, 977 P.2d 582. Here, the affidavit established probable cause to search the U-Haul truck (Warrant 5) but not the various property on Aladdin Road (Warrant 4).
[7] Possession of a stolen firearm is a separate crime, regardless of its value. RCW 9A.56.310. Randy McReynolds does not dispute that his convictions under this provision are separate units of prosecution.
[8] Former RCW 9.54.010 (LAWS OF 1915, ch. 165, § 3), repealed by LAWS OF 1975, 1st Ex. Sess., ch. 260, defined five types of larceny, including theft, wrongful retention of property, and knowing possession, receipt, or concealment of stolen property.
[9] In Makovsky, the court held a person could lawfully be convicted of separate crimes if the State alleges and proves separate acts of receiving the stolen property. Makovsky, 67 Wash. at 9, 120 P. 513.
[10] At best, RCW 9A.56.010(18)(d) and RCW 9.94A.589(1)(a) create an ambiguity on this issue. The result is that the rule of lenity requires a construction in favor of the defendant. Adel, 136 Wash.2d at 635, 965 P.2d 1072.
[11] In 1998, the Legislature added the following language to the SRA: "If an offender is convicted under RCW 9.41.040 for unlawful possession of a firearm in the first or second degree and for the felony crimes of theft of a firearm or possession of a stolen firearm, or both, then the offender shall serve consecutive sentences for each conviction of the felony crimes listed in this subsection, and for each firearm unlawfully possessed." Former RCW 9.94A.400 (LAWS OF 1998, ch. 235, § 2). The Legislature did not amend or repeal the quoted language of RCW 9.41.040(6).
[12] Randy McReynolds also contends in his personal restraint petition that the trial court's "to convict" instruction improperly relieved the State of its burden of proof. We need not address this issue in light of our holding that the multiple convictions for possession of stolen property violated the double-jeopardy prohibitions.