[No. 82219-1.   En Banc.]
Argued March 9, 2010.     Decided October 20, 2011.

THE STATE OF WASHINGTON, *Respondent*, v. GILBERTO
IBARRA-CISNEROS, *Petitioner*.

*Janelle Carman* (of *Carman Law Office*) and *C. Dale Slack* (of *Law Office of C. Dale Slack*), for petitioner.

*James L. Nagle, Prosecuting Attorney,* and *Gabriel E. Acosta* and *Teresa J. Chen, Deputies,* for respondent.

*Daniel J. Walker* and *Douglas B. Klunder* on behalf of American Civil Liberties Union of Washington, amicus curiae.

¶1 STEPHENS, J. — Petitioner Gilberto Ibarra-Cisneros and his brother, Adrian Ibarra-Raya, were separately prosecuted on drug charges in November 2006. Both moved unsuccessfully to suppress evidence discovered as a result of the warrantless search of Ibarra-Raya's home. In particular, Ibarra-Cisneros argued to suppress the evidence against him as the fruit of the unlawful use of Ibarra-Raya's

cell phone, which was seized during the search. The Court of Appeals determined that the search of Ibarra-Raya's home was unlawful, but that "any connection between Mr. Ibarra-Raya's cell phone and the bindle found at Mr. Ibarra-Cisneros's feet is too attenuated to affect his cocaine possession conviction." *State v. Ibarra-Raya,* 145 Wn. App. 516, 524, 187 P.3d 301 (2008) (citing *State v. Tan Le,* 103 Wn. App. 354, 360-62, 12 P.3d 653 (2000)). We granted review and now reverse.

## FACTS

¶2 In the early morning hours of July 14, 2006, Adrian Ibarra-Raya's home was searched by officers of the Walla Walla Police Department. Officers found drugs in the house, arrested Ibarra-Raya, and took him to the police station for questioning. While Ibarra-Raya was at the police station, his brother, Gilberto Ibarra-Cisneros, attempted to reach him on his cell phone. The phone had been seized and was answered in Spanish by a Drug Enforcement Administration agent who was working with the police. The agent did not identify himself, but told Ibarra-Cisneros that his brother was in the bathroom. During the course of the conversation, Ibarra-Cisneros became insistent on speaking with his brother and exchanged angry words with the agent, who ultimately arranged to meet Ibarra-Cisneros in the parking lot of a nearby supermarket.

¶3 At the parking lot, officers followed a pickup in which Ibarra-Cisneros was a passenger. Ibarra-Cisneros got out of the vehicle and stood beside it. Officers testified they found a freshly dropped bindle of cocaine on the ground where Ibarra-Cisneros was standing. The State charged Ibarra-Cisneros with cocaine possession. Ibarra-Raya was charged with possession of marijuana with intent to deliver and possession of cocaine. At a pretrial CrR 3.6 hearing, the defendants jointly sought to suppress evidence seized during the warrantless search of Ibarra-Raya's home. The

State did not argue that Ibarra-Cisneros lacked standing to move to suppress any evidence or that the evidence used against him was too attenuated from the search of the home to be subject to the exclusionary rule. There was no hearing on questions such as whether law enforcement conducted a valid *Terry*[1] stop of Ibarra-Cisneros, whether the cocaine bindle found at his feet was in open view, or whether any evidence obtained following the home search was attenuated from the circumstances of the search. Rather, the record confirms that the suppression hearing for Ibarra-Cisneros and his brother was consolidated and the State treated both men's claims as rising or falling together. *See* Clerk's Papers at 53-62, 101-05, 216-21; Verbatim Report of Proceedings at 6-40. Given this focus of the CrR 3.6 hearing, we have a limited factual record.

¶4 The trial court refused to suppress the evidence, and Ibarra-Raya and Ibarra-Cisneros appealed. The brothers filed a joint brief in the Court of Appeals challenging the State's assertion of various exceptions to the warrant requirement for the search of the home. As an alternative basis to reverse his conviction, Ibarra-Cisneros argued that the State lacked sufficient evidence of constructive possession of cocaine to sustain his conviction. Appellants' Br. at 4-5, 60-62. The defense maintained, "Throughout the proceedings below, there has been no question that if the evidence gathered from the Ibarra-Raya home was suppressed, that the evidence against Mr. Ibarra-Cisneros must also be suppressed." *Id.* at 58-59. The State did not dispute this assertion, but rather relied on all of the evidence gathered after the home search to support Ibarra-Cisneros's conviction, and maintained that all of the evidence was properly admitted. Br. of Resp't at 33-36.

¶5 The Court of Appeals held that the search of Ibarra-Raya's home was unlawful and reversed his conviction. The court affirmed Ibarra-Cisneros's conviction, however, concluding:

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[A]ny connection between Mr. Ibarra-Raya's cell phone and the bindle found at Mr. Ibarra-Cisneros's feet is too attenuated to affect his cocaine possession conviction, when considering the intervening circumstances, temporal factors, and lack of flagrant police conduct.

*Ibarra-Raya*, 145 Wn. App. at 524 (citing *Tan Le*, 103 Wn. App. at 360-62). This conclusion is the sum total of the Court of Appeals attenuation analysis. The court then rejected Ibarra-Cisneros's alternative challenge to the sufficiency of the evidence used to convict him. *Id.*

¶6 The Court of Appeals' cursory application of the attenuation doctrine prompted a petition for review by Ibarra-Cisneros that focused on law enforcement's use of the illegally seized cell phone. The American Civil Liberties Union of Washington filed an amicus brief in support of Ibarra-Cisneros's position. The State did not answer the petition for review or file a supplemental brief, so we have no briefing from the State addressing the attenuation doctrine. We granted Ibarra-Cisneros's petition for review. *State v. Ibarra-Cisneros*, 165 Wn.2d 1036, 205 P.3d 131 (2009).

## ANALYSIS

¶7 Our resolution of this case is dictated by the limited record and briefing before us. While several important issues are suggested by the underlying facts, we will not consider arguments that were waived below. Nor will we engage in a gratuitous examination of the exclusionary rule under federal and state law, including the question of whether the attenuation doctrine is consistent with article I, section 7 of the Washington State Constitution.

¶8 Where it applies, the attenuation doctrine is recognized as an exception to the exclusionary rule. It is well established that "[t]he burden is upon the State to demonstrate sufficient attenuation from the illegal search to dissipate its taint." *State v. Childress*, 35 Wn. App. 314, 316,

666 P.2d 941 (1983); *see also Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939). Courts should not consider grounds to limit application of the exclusionary rule when the State at a CrR 3.6 hearing offers no supporting facts or argument.

¶9 Here, the Court of Appeals affirmed Ibarra-Cisneros's conviction by sua sponte applying the attenuation doctrine as an exception to the exclusionary rule. It did not consider the joint treatment of Ibarra-Raya's and Ibarra-Cisneros's suppression motions below or the lack of a record at the CrR 3.6 hearing on the factors it articulated as supporting an attenuation analysis.[2] Accordingly, the Court of Appeals erred in relying on the attenuation doctrine as the basis to allow the cocaine evidence against Ibarra-Cisneros.

¶10 This case does not require us to consider whether Ibarra-Cisneros has a protectable privacy interest at stake, as the State did not raise this issue below, and there is some indication that the State affirmatively waived this issue when it agreed that the brothers' suppression motions should be treated similarly. For the same reason, there is no question here that Ibarra-Cisneros has standing to challenge the search of his brother's home. In a different case, similar facts may raise issues of standing or the extent of the petitioner's protectable privacy interest, but these issues were not raised below by the State, and we will not consider them for the first time on appeal, particularly in the absence of adequate briefing.

¶11 In light of the way this case has developed, the only fair resolution of Ibarra-Cisneros's appeal is to treat it as the Court of Appeals treated Ibarra-Raya's appeal. The State has not met its burden of purging the taint resulting from the unlawful home search. Rather than reaching for issues not raised below, we return this case to where it started with the acknowledgement that, because the war-

---

[2] The parties have not addressed whether the attenuation doctrine is a recognized exception to the exclusionary rule under article I, section 7 of the Washington State Constitution, and we do not reach that issue.

rantless home search was unlawful, all evidence seized as a result must be suppressed. We reverse the Court of Appeals.[3]

C. JOHNSON, CHAMBERS, OWENS, and FAIRHURST, JJ., and SANDERS, J. PRO TEM., concur.

¶12 ALEXANDER, J. (concurring) — I write separately in order to address the question that prompted this court to grant review: whether the connection between the discovery of cocaine at Gilberto Ibarra-Cisneros's feet and the unlawful seizure of Adrian Ibarra-Raya's cell phone was so attenuated as to dissipate the taint.[4] Having determined that the warrantless search that yielded the cell phone was illegal, it was proper for the Court of Appeals to consider whether that illegality tainted the cocaine evidence that supported Ibarra-Cisneros's conviction for possession of cocaine. The record before us, which contains not only Ibarra-Raya's and Ibarra-Cisneros's joint suppression motion, but also the testimony elicited during Ibarra-Cisneros's two-day trial, is more than adequate to answer that question.

¶13 In affirming Ibarra-Cisneros's conviction, the Court of Appeals relied on the attenuation factors developed by the United States Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975): (1) temporal proximity, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *See State v. Ibarra-Raya*, 145 Wn. App. 516, 524, 187 P.3d 301 (2008) (citing *State v. Tan Le*, 103 Wn. App. 354, 360-62, 12 P.3d 653 (2000)), *review granted*, 165 Wn.2d

---

[3] This resolution makes it unnecessary to consider Ibarra-Cisneros's alternative argument that, even if the challenged evidence is allowed, the evidence is insufficient to support his conviction.

[4] The constitutionality of the attenuation doctrine under article I, section 7 of the Washington Constitution was addressed in both the lead opinion and dissenting opinion in *State v. Eserjose*, 171 Wn.2d 907, 926-29, 259 P.3d 172 (2011).

1036, 205 P.3d 131 (2009). These factors aid courts in determining " ' "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' " *Brown*, 422 U.S. at 599 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (quoting JOHN MACARTHUR MAGUIRE, EVIDENCE OF GUILT 221 (1959))).[5] The court concluded that "any connection between Mr. Ibarra-Raya's cell phone and the bindle found at Mr. Ibarra-Cisneros's feet is too attenuated to affect his cocaine possession conviction." *Ibarra-Raya*, 145 Wn. App. at 524.

¶14 The Court of Appeals' conclusion is belied by the record, which shows that the tainted cell phone was instrumental in the discovery of the cocaine. As the prosecutor said at the hearing on Ibarra-Cisneros's *Knapstad*[6] motion, "The fact is, the phone call led the police to him." Verbatim Report of Proceedings at 75. A review of the sequence of events that led to the seizure of the cocaine reveals that officers exploited the tainted phone at almost every step. Indeed, Ibarra-Cisneros came to the attention of police officers only when his brother's cell phone started "chirping" at the police station. *Id*. at 137. Thereafter, officers used the tainted phone in order to arrange a meeting with Ibarra-Cisneros in a parking lot, to identify him when he arrived at the agreed location, and to verify that the phones in the

---

[5] Contrary to the statement of the concurring justice in *Eserjose*, *Wong Sun* did not distinguish "evidence ' "attenuated" ' from the government's lawless conduct from evidence that has not ' "been come at by exploitation of that illegality" ' in the first place." *Eserjose*, 171 Wn.2d at 932 (Madsen, C.J., concurring) (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939); *Wong Sun*, 371 U.S. at 488 (quoting MAGUIRE, *supra*, at 221)). It *defined* "attenuated evidence" as evidence that has not been " 'come at by exploitation of . . . illegality,' " but " 'instead by means sufficiently distinguishable [note: not *totally* distinguishable] to be purged of the . . . taint.' " *Wong Sun*, 371 U.S. at 488 (quoting MAGUIRE, *supra*, at 221). In fact, the language in question comes from a passage that begins: "A brief study of *attenuation* follows." MAGUIRE, *supra*, at 220 (emphasis added).

[6] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

truck Ibarra-Cisneros was riding in had been used to contact the phone at the police station.

¶15 Thus, the record shows that the cocaine that supported Ibarra-Cisneros's conviction was not " 'come at . . . by means sufficiently distinguishable to be purged of the . . . taint.' " *Wong Sun*, 371 U.S. at 488 (quoting MAGUIRE, *supra*, at 221). The tainted cell phone was in fact the primary means of locating Ibarra-Cisneros, and the police obtained the cocaine as a direct result of this contact. Thus, the connection between the discovery of the cocaine at Ibarra-Cisneros's feet and the unlawful seizure of Ibarra-Raya's phone is not " 'so attenuated as to dissipate the taint.' " *Id.* at 487 (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939)). Therefore, I concur in the judgment to reverse Ibarra-Cisneros's conviction on the ground that the officers exploited the tainted cell phone in obtaining the cocaine.

¶16 MADSEN, C.J. (dissenting) — The issue we are asked to decide is whether we will apply the exclusionary rule to suppress evidence of cocaine that led to defendant Gilberto Ibarra-Cisneros's conviction for possession of cocaine. The majority decides that the only fair resolution of this case is to give Ibarra-Cisneros the benefit of conclusions that the search of his brother's residence was unlawful and that the State has not met its burden of purging taint resulting from that search.

¶17 I disagree with the majority's approach. Unlike in his brother's case, the search of the residence is not the relevant starting point for Ibarra-Cisneros's case. Rather, under the circumstances, the key issue is whether Ibarra-Cisneros had any privacy interest in his brother's cellular telephone (cell phone) or in a conversation on that cell phone in which Ibarra-Cisneros talked to police and that eventually led to discovery and seizure of the cocaine.

¶18 I also disagree with the majority's refusal to consider this issue. Under a fundamental constitutional analy-

sis, there must be a protectable privacy interest at stake before there can possibly be any constitutional violation or any need to address taint or suppression of evidence. When, as in this case, a record unequivocally shows that no such interest exists, a court should not conclude that evidence must be suppressed as the only fair thing to do. There is nothing unfair about declining to suppress evidence when no privacy interest has been at stake and consequently none has been violated.

¶19 The important principles embodied in article I, section 7 of the Washington Constitution require that we begin with the language and core purpose of our state constitutional provision, asking what is it in the particular case that is protected and what this court must do to assure that the constitutional provision is effectuated. Article I, section 7 provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." We are here concerned with whether there has been disturbance of an individual's private affairs without authority of law.

¶20 Our state exclusionary rule differs from the rule applied under the Fourth Amendment to the United States Constitution, which

> applies only when the benefits of its deterrent effect outweigh the cost to society of impairment to the truth-seeking function of criminal trials. In contrast, the state exclusionary rule is constitutionally mandated, exists primarily to vindicate personal privacy rights, and strictly requires the exclusion of evidence obtained by unlawful governmental intrusions.

*State v. Chenoweth*, 160 Wn.2d 454, 472 n.14, 158 P.3d 595 (2007). "[T]he intent" behind article I, section 7 is "to protect personal rights." *State v. Winterstein*, 167 Wn.2d 620, 632, 220 P.3d 1226 (2009) (citing *State v. White*, 97 Wn.2d 92, 110, 640 P.2d 1061 (1982), *abrogated on other grounds by State v. Potter*, 156 Wn.2d 835, 132 P.3d 1089 (2006)); *see also White*, 97 Wn.2d at 110 ("the emphasis is on protecting personal rights rather than on curbing governmental actions").

¶21 Therefore, as we have recently explained, our state constitutional provision requires an exclusionary rule that "provides a remedy for individuals *whose rights have been violated.*" *Winterstein*, 167 Wn.2d at 632 (emphasis added). " '[W]henever the right is unreasonably violated, the remedy must follow.' " *Id.* (quoting *White*, 97 Wn.2d at 110). The remedy that is embodied in the exclusionary rule is exclusion of evidence that has been obtained in violation of the defendant's privacy rights.

¶22 But before the remedy, there must be the violation, and before the violation, there must be the privacy right. Thus, we need to ask, what is protected in this case by the exclusionary rule? What privacy rights existed that were violated by agents of the government, and thus remediable by applying the exclusionary rule?

¶23 The answer is, there were none. Ibarra-Cisneros had no protected privacy interest in his brother's cell phone or in any information stored on it.

¶24 The majority declines to address the nature and extent of Ibarra-Cisneros's protectable privacy interest. But, if Ibarra-Cisneros had no privacy interest at stake, there could be no violation of article I, section 7, and no need to require suppression as a remedy for any violation. As mentioned, the exclusionary rule "provides a remedy for individuals *whose rights have been violated.*" *Winterstein*, 167 Wn.2d at 632 (emphasis added).

¶25 I would conclude that there are no privacy interests at issue under the facts and circumstances of this case, as the record clearly shows. First, Ibarra-Cisneros himself had no privacy interest in his brother's cell phone or in his phone conversation with a drug enforcement agent who answered the cell phone at the police station. Second, although, as Ibarra-Cisneros contends, cell phones can now store a large amount of personal information, none has ever

been of concern in this case and, even if it were, the privacy interest in that information would belong to the owner of the cell phone, not a third party calling the cell phone number.

## Discussion

¶26 Adrian Ibarra-Raya's cell phone was in police custody when it rang and an agent for the Drug Enforcement Agency (DEA) answered it. His brother Ibarra-Cisneros was the caller. Conversations occurred between the agent and Ibarra-Cisneros while the cell phone was in "walkie-talkie format." 1 Verbatim Report of Proceedings (VRP) at 141; *see also id.* at 148-49 ("walkie-talkie situation"); *id.* at 193 (like a "walkie-talkie system"). Thus, anyone near the cell phone was able to hear Ibarra-Cisneros's side of the conversation as well as the agent's.

¶27 Ibarra-Cisneros asked for his brother Adrian, and the agent told him his brother was in the bathroom and offered to take a message. This exchange was repeated, with Ibarra-Cisneros becoming more agitated. Eventually Ibarra-Cisneros said, "You know, I'm going to put a bullet between your eyes" and challenged the agent, "Well, you want to meet?" *id.* at 139. The agent agreed and they arranged to meet at a certain store. Local police officers set up surveillance and eventually they and the defendant ended up in a shopping mall parking lot where officers parked in view of the pickup truck in which Ibarra-Cisneros was the passenger. During the subsequent encounter, police discovered a bindle of cocaine on the asphalt where Ibarra-Cisneros had been standing. Mr. Ibarra-Cisneros was charged with and convicted of possession of cocaine.

¶28 Among other things, Ibarra-Cisneros contends that the evidence against him must be suppressed because it was the direct result of the agent's inappropriate use of his brother's illegally seized cell phone. The cell phone had been seized when the brother's residence was searched. Ibarra-

Cisneros argues that an illegally seized cell phone cannot be used to obtain evidence against persons calling the cell phone's number and he also complains about police accessing a cell phone's calling history or other data stored on a cell phone. He contends such use violates article I, section 7, because of privacy interests of persons calling cell phone numbers and privacy interests in the information stored on cell phones.

¶29 The exclusionary rule in this state is "nearly categorical" and, with few exceptions, applies to require suppression of evidence obtained in violation of the protections afforded privacy interests by article I, section 7. Because this is true, and as explained at the outset of this opinion, the exclusionary rule is not at issue unless there is a privacy interest that has been disturbed.

¶30 It must be remembered that it is Ibarra-Cisneros, not his brother, Ibarra-Raya, who is making the arguments here. Of equal importance are the specific arguments he is making—that under article I, section 7, he has a privacy interest as the caller on a cell phone call and he has privacy interests in the contents of the cell phone. He argues that these privacy interests invariably require that all information or evidence obtained through use of an illegally seized cell phone must be suppressed, no matter what other circumstances may exist or who the defendant is.

¶31 Ibarra-Cisneros had no privacy interest in his brother's cell phone. In basic terms, it was not his cell phone. He also had no interest in the information stored on it.

¶32 It is true that a cell phone may contain a vast amount of personal information, including photographs and videos. However, the simple fact is that absolutely nothing stored on the cell phone here, if indeed anything was stored, has any relationship whatsoever to this case or Ibarra-Cisneros's conviction. Critically, article I, section 7 states that "[n]o person shall be disturbed in *his* private affairs, or his home invaded, without authority of law." (Emphasis added.) There is no evidence or even any suggestion that

police officers accessed or used any such information. The meeting with Ibarra-Cisneros came about because of the verbal exchange between the DEA agent and Ibarra-Cisneros when Ibarra-Cisneros called the cell phone number and the agent answered, and that is the sum total of the information obtained and used by the officers.

¶33 Under these circumstances, Mr. Ibarra-Cisneros cannot claim any privacy violations relating to information that might have been stored on the cell phone.

¶34 Turning to the matter of the DEA agent answering the phone and the conversations between the agent and Ibarra-Cisneros, in *State v. Goucher*, 124 Wn.2d 778, 881 P.2d 210 (1994), police were executing a search warrant at the residence of a suspected drug dealer when the telephone rang. An officer answered the call and, when asked, told the caller that the dealer had gone on a run and he was handling the business until the dealer returned. The caller identified himself and expressed his desire to purchase drugs. Arrangements for the purchase were made, and when the caller arrived and turned over money, he was arrested. This court found no violation of article I, section 7 because the defendant voluntarily engaged in a telephone conversation he instigated with an acknowledged stranger and stated he wanted to buy drugs. *Id.* at 784-85.

¶35 Similarly, Ibarra-Cisneros has no privacy interest at stake with regard to the cell phone conversation because he called the cell phone number and voluntarily spoke to a stranger, assuming the risk that what he said was not private. The DEA agent did not pretend to be Ibarra-Cisneros's brother, but instead told Ibarra-Cisneros that his brother was in the bathroom. Ibarra-Cisneros clearly knew he was speaking to a stranger and he does not claim otherwise. Not only did he voluntarily speak to a stranger, he did so over a phone that was in "walkie-talkie" mode, making whatever he said equally available to any other stranger within hearing distance.

¶36 The fact that the officer in *Goucher* was lawfully on the premises does not alter the analysis because the determinative facts are the same. There can be no privacy interest in a cell phone conversation voluntarily entered into with someone known to be a stranger. This is even more the case when the conversation is over a phone set to "walkie-talkie" mode.

¶37 A number of courts deciding similar cases under the Fourth Amendment have concluded that whether law enforcement officers were lawfully on the premises when they answered a phone is irrelevant if the defendant cannot show that he or she had a protected privacy interest in the phone or the conversation itself. Thus, in *United States v. Congote*, 656 F.2d 971 (5th Cir. 1981), and *State v. Gonzalez*, 278 Conn. 341, 898 A.2d 149 (2006), the courts concluded that, regardless of whether police were unlawfully on the premises, no constitutional violation occurred when the defendants voluntarily spoke with police officers who answered a telephone and a cell phone, respectively, knowing the person answering to be a stranger but nonetheless making incriminating statements about drug transactions that led to their arrests. In *Congote*, 656 F.2d at 976, the court observed that the defendant "instituted the calls and spoke voluntarily and without hesitation to the agents. None of the agents pretended to be Brock, the party that appellant wished to reach. Appellant had no legitimate expectation of privacy in his telephone conversation with the agents. He assumed the risk of exposure when he spoke freely with strangers." In *Gonzalez*, 278 Conn. at 352, the defendant conceded he had no privacy expectation that would allow him to challenge the police seizure of his codefendant's cellular telephone, but claimed a protected interest in his own words spoken during the conversation. The court rejected the argument, saying that "no such expectation exists when the speaker voluntarily speaks to someone whose identity he has made no attempt to ascertain." *Id.* at 353.

¶38 The facts in *People v. Rodriguez*, 13 A.D.3d 257, 786 N.Y.S.2d 175 (2004), are like those in the present case. While police were processing an arrestee his cell phone rang. The police suspected a drug deal and answered the cell phone after the arrestee said that the caller was " 'probably the guy with the stuff.' " *Id.* at 257. The caller implicated himself in a drug deal, and through subsequent calls from the caller to the cell phone the police set up a meeting and then arrested the caller. The court found no constitutional violation because the caller voluntarily chose to speak to the individual who answered the cell phone and assumed the risk it was not actually the person he was trying to reach. *Id.* at 258. The court held the caller "had no legitimate privacy interest in the conversations he unwittingly chose to have with the officer." *Id.*

¶39 Although these cases were decided under the Fourth Amendment, they are entirely consistent with this court's analysis in *Goucher*, and explain why Ibarra-Cisneros could have no privacy interest in his brother's cell phone.

¶40 I would hold that under article I, section 7, Ibarra-Cisneros had no privacy interest in his brother's cell phone or in his conversation over that phone when he voluntarily chose to speak to a stranger, particularly when he chose to do so over a phone set to broadcast whatever he said to anyone within hearing range of the cell phone in "walkie-talkie format."

¶41 Contrary to Ibarra-Cisneros's arguments about privacy interests in the information stored on cell phones and conversations on cell phones, the facts of this case are clear and establish that he lacks the privacy interests that he asserts. The court should conclude that Mr. Ibarra-Cisneros had no privacy interests in the cell phone or in his voluntary conversation with a stranger over what was essentially a "walkie-talkie." That being the case, there was no violation of his rights under article I, section 7, and there is no reason to apply the exclusionary rule in this case.

¶42 Unfortunately, however, rather than addressing the important question whether Ibarra-Cisneros had any privacy interest at stake, the majority gives Ibarra-Cisneros the benefit of constitutional protection afforded Adrian Ibarra-Raya's privacy interests, although there is no question on this record that Ibarra-Cisneros is not entitled to any exclusionary remedy because there was no violation of his *own* privacy interests. This is an extraordinary and unjustified conclusion, in my view.[7]

¶43 Next, I turn to the question whether the evidence was sufficient to sustain Mr. Ibarra-Cisneros's conviction for possession of cocaine. The defendant has argued that all the evidence shows is proximity—the position of the bindle of cocaine in relationship to where he was standing—and this is as a matter of law insufficient to establish constructive possession. If the defendant were correct about the evidence, he would be correct about the conclusion. He is not.

¶44 When assessing sufficiency of the evidence to sustain a conviction, the facts and inferences from the facts must be considered in the light most favorable to the State and the question is "whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *State v. Elmi*, 166 Wn.2d 209, 214, 207 P.3d 439 (2009).

¶45 Under RCW 69.50.4013(1), "[i]t is unlawful for any person to possess a controlled substance," with exceptions not applicable here. The only element of the crime that is at issue is the fact of possession by the defendant. *See State v. Staley*, 123 Wn.2d 794, 798, 872 P.2d 502 (1994); *State v.*

---

[7] The majority also declines to address the issue of Ibarra-Cisneros's standing. I am not concerned with the question of whether Mr. Ibarra-Cisneros can complain about asserted constitutional violations, i.e., standing. My concern goes to a more fundamental issue: How can we analyze an article I, section 7 issue without identifying the specific privacy interest that has allegedly been violated? If there is no privacy interest at stake, any attempt at analysis is necessarily an exercise in assumptions or, as in the majority opinion, an exercise in granting the defendant the constitutional protection due another person's privacy interests.

*Cleppe*, 96 Wn.2d 373, 378, 635 P.2d 435 (1981); 11 WASH-INGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMI-NAL 50.02, at 946 (3d ed. 2008) (WPIC). Possession may be either actual possession or constructive possession, and means "having a substance in one's custody or control." WPIC 50.03, at 949. Constructive possession requires that the person has dominion and control over the goods. *Staley*, 123 Wn.2d at 798. Mere proximity does not establish dominion and control. *Id.* at 801.

¶46 Viewing the evidence in the light most favorable to the State, at the time that Ibarra-Cisneros called and engaged in conversation with the DEA agent, law enforcement officers had arrested Ibarra-Raya after discovering cocaine and a large amount of money in his home. During the conversation between Ibarra-Cisneros and the DEA agent, Ibarra-Cisneros became agitated when he could not speak to his brother, and eventually threatened to put a bullet between the agent's eyes and then challenged the agent to meet. The DEA agent testified that he thought that Ibarra-Cisneros's threat to put a bullet between the agent's eyes was a serious threat, that Ibarra-Cisneros meant it.

¶47 The DEA agent also testified that he answered the cell phone in order to continue the investigation involving Ibarra-Raya, knowing that drug dealing arrangements are sometimes made using cell phones or a "walkie-talkie" format. The call he answered was received on a cell phone owned by someone then believed to be a drug dealer, with the caller making the threat of violence after he learned he could not speak with his brother, the phone's owner. Given this context, the officers legitimately set up surveillance while investigating both a threat of deadly violence and possible drug activity.

¶48 The undercover officer who was dispatched to the designated meeting place, a local store, watched for the

model of car that Ibarra-Cisneros had said he would be in.[8] After he was there 5 or 10 minutes he saw a pickup come into the store's parking lot very slowly with two Hispanic individuals obviously looking for someone or something. It circled the lot and stopped near the surveillance vehicle, at which time the officer could see that the passenger, who turned out to be Ibarra-Cisneros, had a cell phone in his hand. The pickup stayed a short time and drove out of the lot. The undercover officer also left and when he stopped at a light with the pickup broadside to him, he could see Ibarra-Cisneros on the cell phone at the same time the officer's partner said that the police were talking to the caller (Ibarra-Cisneros). The officer was sure that it was the caller in the pickup.

¶49 A second undercover car took over surveillance to avoid having the occupants of the pickup confirm they were under surveillance. The officers in the second car were close enough to see that the occupants of the pickup "were definitely concerned about what was going on behind them" and the officers could see "some swivel-necking going on," they "were pretty animated and looking around . . . obviously checking . . . more exaggerated than the average driver." 1 VRP at 161, 195. The officers followed the pickup into a mall parking lot where the pickup parked and the driver exited and went into the mall. The officers saw Ibarra-Cisneros also exit the vehicle on the passenger side and walk to the front of the vehicle. One of the officers testified that Ibarra-Cisneros continuously watched them, maintaining eye contact while they drove through the lot and parked behind the pickup several rows back. Ibarra-Cisneros walked toward the back of the truck on the passenger side and continued to watch the officers.

¶50 The officers decided they should make contact with Ibarra-Cisneros, reasoning that if there was going to be a

---

[8] As the DEA agent testified, there were several conversations over the period of time between the first call and the eventual contact, during which Ibarra-Cisneros identified the type and color of car he would be in, asked where the agent was, and stated his own estimated arrival time.

problem with violence, it was better to be out of the car. The officers testified that Ibarra-Cisneros had his left hand in his pants pocket, and one of the officer testified that this caused concern since they "had a phone conversation about this person we were looking for wanting to put a bullet into [the DEA agent's] head" and, the officer further testified, "I had reason to believe he may be armed." *Id.* at 165-66.

¶51 As the officers approached with guns out but in a lowered position,[9] the driver came out of the mall and then hurriedly started to go back in when he saw them. He stopped when the second officer identified them as police. At this point the first officer was about a car's length from Ibarra-Cisneros. After being told to take his hands out of his pocket more than once, Ibarra-Cisneros complied. The officers approached Ibarra-Cisneros and were in the process of handcuffing him when the second officer pointed to the ground next to Ibarra-Cisneros's feet where the bindle of what proved to be cocaine was located just behind the passenger door, at Ibarra-Cisneros's feet where he was standing between the open door and the seat, facing toward the back of the truck. Ibarra-Cisneros had been on that side of the truck during the entire time the officers watched him.

¶52 The bindle was "just a little plastic parcel." *Id.* at 170. It had a ball of white substance at one end and was about an inch and a half from the bulb part to the end of the bindle where the plastic flared out above the tied-off point. One officer testified that if it had been there before the pickup truck arrived the truck would have run over the bindle given the way a photograph introduced into evidence showed the truck parked. However, it did not look as if it had been driven over. Rather, it appeared to have been recently deposited and was fresh looking and not dusty.

---

[9] As one of the officers testified, the guns were not pointed at Ibarra-Cisneros or the driver, but "were drawn at low ready. We don't actually point our guns at somebody unless there is a threat there." 1 VRP at 217.

¶53 One of the officers spoke Spanish fluently, the language that Ibarra-Cisneros also speaks. He testified that after he notified the first officer of the bindle, they collected it, and he advised Ibarra-Cisneros that he was under arrest. Ibarra-Cisneros said, "If you saw me drop it, then I'll admit it's mine" or "I'll say it's mine. But if you didn't see me drop it then you can't charge me with it." *Id.* at 210-11. The officer testified that Ibarra-Cisneros did not appear to be joking but rather "trying to make a point" because, the officer explained, Ibarra-Cisneros did not understand there was probable cause to arrest. *Id.* at 211.

¶54 There is sufficient evidence supporting the conviction. As we have frequently noted, the determination of whether probable cause exists to make an arrest is determined based on the totality of facts and circumstances known by the officer at the time of the arrest. *E.g.*, *Potter*, 156 Wn.2d at 844; *State v. Knighten*, 109 Wn.2d 896, 899, 748 P.2d 1118 (1988). The invalidation of the warrantless search of Ibarra-Cisneros's brother's house had not yet occurred, and it was appropriate for police to consider the possibility of a drug connection between a person calling a cell phone owned by an arrestee having drugs and large amounts of cash in his home. Thus, it is appropriate to consider that the officers were investigating possible drug activity. It is also appropriate to consider that a serious threat of deadly violence had been made by someone possibly engaged in drug transactions and the possibility of this threat being carried out.

¶55 The bindle was discovered immediately next to Ibarra-Cisneros in the middle of a parking lot. There was evidence that the drug is expensive, and a rational jury could reasonably infer that it would not be casually discarded in a parking lot. It was fresh looking and not dusty, and did not look as if it had been run over despite evidence that the pickup truck was positioned in a way that indicated it would have run over the bindle had the bindle been there when the truck was parked. Because the officers

drove around the truck and parked several rows back, it is reasonable to infer they could not have seen Ibarra-Cisneros drop the bindle during that time because they were too far away to see such a small item. As they approached, they were intent on Ibarra-Cisneros and watching his hands because of concerns that he might be armed. The officers thus might have missed seeing the bindle on the ground as they drew closer.

¶56 Even if the bindle were dropped after the officers closed in, a rational jury could infer that when the driver came out of the mall both officers were momentarily distracted, giving Ibarra-Cisneros the chance to discard the bindle unobserved.

¶57 Highly relevant to the question of sufficiency is the statement that Ibarra-Cisneros himself made when the officers discovered the bindle. As the trial judge observed when he denied the defense *Knapstad*[10] motion based on insufficient evidence, one interpretation is that the only way that Ibarra-Cisneros would make the statement is if he had the bindle in the first place. A rational juror could readily have concluded from the evidence that Ibarra-Cisneros believed that he could not be arrested unless the police actually saw him drop the bindle (which is untrue), and that he would admit to the bindle being his if they did. Put another way, the jury was entitled to believe Ibarra-Cisneros meant that he did drop the drug but he was not going to say so unless the officers actually saw him drop it. The jury could rationally have viewed the statement as very nearly an outright admission of guilt.

¶58 There is sufficient evidence supporting Ibarra-Cisneros's conviction.

## Conclusion

¶59 Mr. Ibarra-Cisneros argues that use of an illegally seized cell phone always requires suppression of any evi-

---

[10] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

dence obtained as a result of officers' accessing information stored on the cell phone or using the cell phone, including answering calls made to the cell phone. He contends suppression is required because such conduct in this case violated protections afforded to privacy interests by article I, section 7.

¶60 There is no evidence that police officers accessed or used any information stored on the cell phone. Accordingly, Ibarra-Cisneros clearly has no privacy interest in any such information at stake in this case. Further, Ibarra-Cisneros had no privacy interest in the cell phone, which was not his, or in the conversation he voluntarily engaged in with the DEA agent who answered the cell phone, who was known by Ibarra-Cisneros to be a stranger.

¶61 We should decline to apply the exclusionary rule unless there has been a violation of privacy rights. Any other approach conflicts with the mandate to apply the exclusionary rule as a remedy for violation of privacy rights and thereby carry out article I, section 7's purpose to protect individual privacy interests. Here, no privacy rights of Ibarra-Cisneros have been at issue.

¶62 The trial court properly declined to suppress the evidence against Ibarra-Cisneros, and his conviction for possession of cocaine should be affirmed.

¶63 J.M. JOHNSON, J. (dissenting) — The majority throws up its hands in the face of clear evidence supporting the jury's verdict and reverses that verdict, without answering the question for which we granted review. The record before us clearly shows that two police officers lawfully, in a public parking lot, saw a bindle[11] of cocaine at Gilberto Ibarra-Cisneros' feet just after he had exited a pickup truck. The bindle was fresh, showing no dust or dirt. After Ibarra-

---

[11] A bindle is a small envelope made by folding a square piece of paper, often used for carrying powdered illegal drugs.

Cisneros was arrested and advised of his *Miranda*[12] rights, he told the police officers, " 'If you saw me drop it, then I'll admit it's mine . . . [b]ut if you didn't see me drop it then you can't charge me with it.' " 1 Verbatim Report of the Proceedings (VRP) at 210-11.

¶64 The officers had the authority of law necessary under article I, section 7 of the Washington Constitution to arrest Ibarra-Cisneros and to seize the cocaine bindle. They had probable cause to arrest, and the cocaine bindle was in open view. The bindle, therefore, was properly admitted into evidence at trial. The jury decided Ibarra-Cisneros constructively possessed the cocaine bindle and convicted him. Because the majority reverses this clear-cut verdict, I dissent.

FACTS

¶65 The majority asserts that the State has not met its burden in this case. Majority at 885. A closer look at the record demonstrates otherwise.

A. *The Search of Adrian Ibarra-Raya's Residence*

¶66 In the early morning hours of July 14, 2006, officers from the Walla Walla Police Department conducted a warrantless search of a house subleased by Adrian Ibarra-Raya, the defendant's brother. After obtaining a warrant, the officers found large quantities of illegal drugs. The officers arrested Adrian and transported him to the police station.

B. *The Cell Phone*

¶67 Adrian's cell phone rang several times at the police station. It was answered by Agent Rafael Palacios, a federal Drug Enforcement Administration officer. Ibarra-Cisneros asked to speak with Adrian. When Agent Palacios refused,

---

[12] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1996).

Ibarra-Cisneros threatened to "put a bullet between [Agent Palacios's] eyes." 1 VRP at 139. Ibarra-Cisneros then asked Agent Palacios if he wanted to meet. Agent Palacios assented and asked Ibarra-Cisneros where to meet. The two arranged to meet in the parking lot of Super One Foods in Walla Walla.

C. *The Local Police Meet Ibarra-Cisneros in a Public Parking Lot*

¶68 Officer Steve Harris was detailed to the Super One Foods parking lot to wait for Ibarra-Cisneros. After 5 to 10 minutes, Officer Harris saw two Hispanic males driving slowly into the parking lot in a Ford pickup truck. The passenger, defendant Ibarra-Cisneros, appeared to be looking for someone. The Ford pickup pulled up next to Officer Harris' vehicle. Officer Harris saw that Ibarra-Cisneros had a cell phone in his hand. The Ford pickup truck then departed from the Super One Foods parking lot. Officer Harris followed. Meanwhile, Sergeant Randy Allessio and Officer Saul Reyna were in the general area. They were alerted and followed Officer Harris and Ibarra-Cisneros. Agent Palacios remained at the police station. According to Agent Palacios, "[Ibarra-Cisneros] kept tripping me[13] asking where I was," and stated several times, "Where you at? Where you at?" *Id.* at 139-40.

D. *The Arrest*

¶69 The pickup truck came to a stop in the Blue Mountain Mall parking lot. Sergeant Allessio and Officer Reyna drove past and observed Ibarra-Cisneros get out and walk to the front of the vehicle with his hands in his pockets. The officers pulled in behind, as Ibarra-Cisneros watched.

---

[13] That is, Ibarra-Cisneros initiated contact with Agent Palacios in some way, either by calling or by paging. *See* 1 VRP at 144. Agent Palacios had ended the conversation after Ibarra-Cisneros arranged to meet him at Super One Foods. *Id.* at 139.

¶70 Concerned for their safety and that of the public,[14] the officers got out of the vehicle. Officer Reyna ordered Ibarra-Cisneros to put his hands up. Officer Reyna told Ibarra-Cisneros to remove his left hand from his pocket.

¶71 Officer Reyna looked down and saw a bindle at Gilberto Ibarra-Cisneros' feet, adjacent to the parking stall strip next to the pickup. The bindle was fresh, showing no dust or dirt. Officer Allessio also saw the bindle. The officers patted down Ibarra-Cisneros.

¶72 Meanwhile, other officers arrived at the mall, arrested Ibarra-Cisneros, and advised him of his *Miranda* rights. *Id.* at 209. After he was arrested, Ibarra-Cisneros stated, referring to the bindle, " 'If you saw me drop it, then I'll admit it's mine . . . [b]ut if you didn't see me drop it then you can't charge me with it.' " *Id.* at 210-11.

PROCEDURAL HISTORY

¶73 The majority decides not to engage in a robust analysis of this case because of "the way this case has developed." Majority at 885. This is not an adequate reason to pass on a case for which there is clearly an answer. While the majority describes the Court of Appeals' analysis as "cursory,"[15] it is important to remember that the Court of Appeals was asked to review, in general, whether any exceptions to the warrant requirement applied. *See* Appellants' Br. at 2-4; Br. of Resp't at 2. Finding that none of the exceptions the State raised applied, it was not unreasonable for the Court of Appeals to state the law accurately and to reach the just result using an appropriate and long-recognized analytical tool, the attenuation doctrine.

¶74 As explained below, we should affirm the Court of Appeals and answer the question for which we granted

---

[14] Officer Allessio testified that he had reason to believe the passenger was armed based on the threat Ibarra-Cisneros had made on the phone. 1 VRP at 165-66.

[15] Majority at 884.

review.[16] The facts that brought Ibarra-Cisneros and the police officers together are far too attenuated from the legal arrest and the seizure of the cocaine bindle to affect his conviction. Any prior taint does not extend to invalidate the officers' lawful acts.

ANALYSIS

¶75 The federal attenuation doctrine, an exception to the exclusionary rule, is consistent with article I, section 7 of the Washington Constitution.[17] This exception was first enunciated in *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939), and was reiterated in *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). These cases have been cited and applied by this court since the 1960s,[18] and we have even

---

[16] *See* Pet. for Review at 5-6; *State v. Ibarra-Cizneros*, 165 Wn.2d 1036, 205 P.3d 131 (2009) (granting review).

[17] This is not to say that the federal attenuation doctrine will always comport with our interpretation of article I, section 7. *Compare Hudson v. Michigan*, 547 U.S. 586, 603, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) ("the causal link between a violation of the knock-and-announce requirement and a later search is too attenuated to allow suppression" (Kennedy, J., concurring)), *with State v. Coyle*, 95 Wn.2d 1, 14, 621 P.2d 1256 (1980) (stating that suppression is the proper remedy for violations of Washington's knock-and-wait rule), *and State v. Richards*, 136 Wn.2d 361, 962 P.2d 118 (1998)).

[18] *E.g., State v. O'Bremski*, 70 Wn.2d 425, 428, 423 P.2d 530 (1967) ("We have consistently adhered to the exclusionary rule expounded by the United States Supreme Court and have likewise embraced the 'fruit of the poison tree' doctrine . . . ."); *State v. Vangen*, 72 Wn.2d 548, 555, 433 P.2d 691 (1967) (stating that the attenuation doctrine "fits the present situation with tailor-like exactness" and affirming defendant's conviction); *State v. Rothenberger*, 73 Wn.2d 596, 601, 440 P.2d 184 (1968) (finding that "[t]he 'poison' . . . which had inhered in the original unlawful arrest was so greatly attenuated by the time and circumstances intervening . . . that it had lost its potency, if it ever had any"). The *Rothenberger*, *O'Bremski*, and *Vangen* courts each affirmed the defendant's conviction. *Rothenberger*, 73 Wn.2d at 601; *O'Bremski*, 70 Wn.2d at 430; *Vangen* 72 Wn.2d at 555; *see also McNear v. Rhay*, 65 Wn.2d 530, 541, 398 P.2d 732 (1965) (citing *Nardone*, 308 U.S. 338), *abrogated on other grounds by State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994); *State v. Riggins*, 64 Wn.2d 881, 886 n.2, 395 P.2d 85 (1964) (citing *Wong Sun*, 371 U.S. 471); *State v. Warner*, 125 Wn.2d 876, 888, 889 P.2d 479 (1995) (remanding to the trial court to determine whether any exceptions to the "fruit of the poisonous tree" doctrine applied, including the federal attenuation doctrine); *State v. Tan Le*, 103 Wn. App. 354, 362, 12 P.3d 653 (2000)

remanded its application to the trial court[19] and have applied the United States Supreme Court's consideration of a fourth factor (whether *Miranda* warnings were given) where applicable.[20]

## I. *The Exclusionary Rule*

### A. *Summary of the Federal and State Exclusionary Rules*

¶76 The exclusionary rule is a judicially created remedy for constitutional violations of the Fourth Amendment to the United States Constitution and its Washington State counterpart, article I, section 7.[21] Ibarra-Cisneros contends that the exclusionary rule should apply to the cocaine bindle found at his feet because its seizure violated both the Fourth Amendment to the United States Constitution and

---

(holding that a postarrest identification was not attenuated from the illegal arrest); *State v. McReynolds*, 117 Wn. App. 309, 323, 71 P.3d 663 (2003) (finding that certain facts supported the trial court's finding of attenuation but others did not, and remanding to the trial court for new findings and conclusions of law).

[19] In *Warner*, 125 Wn.2d at 889, we remanded to the trial court to determine "whether the string of causation was sufficiently attenuated so as to bring it within the [attenuation] exception." The trial court did not reach the issue on remand because the defendant pleaded guilty. Statement of Def. on Plea of Guilty, *State v. Warner*, No. 92-1-01045-8 (Snohomish County Super. Ct., Wash. Sept. 9, 1996). Before agreeing to the plea, however, the State argued why its evidence was attenuated in that case, relying on the Washington Supreme Court's holding above. *See* State's Mem. of Law Pertaining to Remanded Suppression Hr'g, *Warner*, No. 92-1-01045-8, at 3-4 (Mar. 21, 1996).

[20] *State v. Armenta*, 134 Wn.2d 1, 17, 948 P.2d 1280 (1997) (considering " 'giving of *Miranda* warnings' " in addition to " 'temporal proximity of the illegality and the subsequent consent,' " " 'the presence of significant intervening circumstances,' " and " 'the purpose and flagrancy of the official misconduct' " (internal quotation marks omitted) (quoting *State v. Soto-Garcia*, 68 Wn. App. 20, 27, 841 P.2d 1271 (1922))); *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

[21] *See also Boyd v. United States*, 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886) (first federal court shift away from the common law "nonexclusionary" rule, which required a court to admit all competent and probative evidence regardless of its source, *e.g.*, *Commonwealth v. Dana*, 43 Mass. (2 Met.) 329 (1841), *cited in* Sanford E. Pitler, *The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy*, 61 WASH. L. REV. 459, 466 n.36 (1986)); *State v. Gibbons*, 118 Wash. 171, 203 P. 390 (1922) (first adoption of an exclusionary rule in Washington State). *But see State v. Royce*, 38 Wash. 111, 80 P. 268 (1905) (rejecting the *Boyd* exclusionary rule and *not* addressing whether defendant's article I, section 7 rights were violated).

article I, section 7 of the Washington State Constitution. He argues that the bindle's seizure was connected to the unlawful search of his brother's residence and, therefore, is "fruit of the poisonous tree." Pet. for Review at 8, 10.

¶77 The first question we must answer, therefore, is whether article I, section 7 requires exclusion of the cocaine bindle. If article I, section 7 does not require exclusion, then neither does the Fourth Amendment (assuming article I, section 7 offers more protection than the Fourth Amendment).[22]

## B. *The Exclusionary Rule under Article I, Section 7*

¶78 The exclusionary rule under article I, section 7 has been described as "nearly categorical." *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009);[23] *State v. Afana*, 169 Wn.2d 169, 181, 233 P.3d 879 (2010).[24] However, because the federal attenuation doctrine is not incompatible with the Washington Constitution for the reasons referred to in *Afana* and *Winterstein*,[25] and because this court has repeatedly referenced and applied the federal standard,[26] we should not hesitate to affirm the Court of Appeals' application of the attenuation doctrine to this case.

---

[22] We have previously interpreted article I, section 7 to provide greater protection than the Fourth Amendment as a result of its distinct language, purpose, and history. *E.g., State v. Morse*, 156 Wn.2d 1, 10, 123 P.3d 832 (2005); Charles W. Johnson, *Survey of Washington Search and Seizure Law: 2005 Update*, 28 Seattle U. L. Rev. 467, 587 (2005)); *State v. Ladson*, 138 Wn.2d 343, 348, 979 P.2d 833 (1999); *State v. Gunwall*, 106 Wn.2d 54, 63-64, 720 P.2d 808 (1986).

[23] The majority's analysis of the inevitable discovery exception in *Winterstein* was unnecessary to its holding. *Winterstein*, 167 Wn.2d at 638 (J.M. Johnson, J., concurring). This court upheld the inevitable discovery exception in *Warner*, 125 Wn.2d at 889, at least in some cases. *Winterstein*, 167 Wn.2d at 638-39.

[24] The warrantless search of Afana's vehicle incident to the arrest of his passenger would have been constitutional if the arresting officer had perceived a threat to his safety. *Afana*, 169 Wn.2d at 184-85 (J.M. Johnson, J., concurring).

[25] *See State v. Eserjose*, 171 Wn.2d 907, 913, 918, 927-29, 259 P.3d 172 (2011).

[26] *See supra* note 18.

## 1. *Washington applies the federal attenuation doctrine*

¶79 This court has employed the attenuation doctrine time and time again in prior decisions to determine whether challenged evidence was " 'fruit of the poisonous tree' " or so " 'attenuated as to dissipate the taint.' " *State v. Eserjose*, 171 Wn.2d 907, 919, 259 P.3d 172 (2011) (quoting *Nardone*, 308 U.S. at 341 and citing *State v. Warner*, 125 Wn.2d 876, 889 P.2d 479 (1995); *State v. Rothenberger*, 73 Wn.2d 596, 440 P.2d 184 (1968); *State v. Vangen*, 72 Wn.2d 548, 433 P.2d 691 (1967)). There has never been a need to explicitly adopt the doctrine under article I, section 7 because there has never been a concern about its propriety. Instead, we have consistently adhered to the federal attenuation doctrine to the exclusionary rule, as first enunciated in *Nardone* and as reiterated in *Wong Sun*, 371 U.S. at 491. *Eserjose*, 171 Wn.2d at 912-20.

¶80 Although many of these rulings were precipitated by the Court's holding in *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961),[27] we have not questioned the application of the attenuation doctrine in light of article I, section 7 because, as we said in *O'Bremski*, "[w]e have consistently adhered to the exclusionary rule expounded by the United States Supreme Court [since 1922] and have likewise embraced the 'fruit of the poison tree' doctrine," even extending it to secondary evidence. *State v. O'Bremski*, 70 Wn.2d 425, 428, 423 P.2d 530 (1967) (citations omitted).

¶81 Notably, several of our holdings applying the attenuation doctrine have been made *after* this court began asserting that article I, section 7 provides greater protections than the Fourth Amendment in this area. *Compare* Sanford E. Pitler, *The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right*

---

[27] *See generally Mapp*, 367 U.S. at 660 (holding that the right to privacy embodied in the Fourth Amendment is enforceable against the states through the due process clause of the Fourteenth Amendment).

*and Constitutionally Compelled Remedy*, 61 WASH. L. REV. 459, 493-98 (1986), *and Warner*, 125 Wn.2d at 888 ("if the 'fruit' is sufficiently attenuated from the original illegality, then it may be admitted" (citing *Nardone*, 308 U.S. at 341)); *see also State v. Tan Le*, 103 Wn. App. 354, 12 P.3d 653 (2000); *State v. McReynolds*, 117 Wn. App. 309, 71 P.3d 663 (2003). In our most recent case on the topic, we specifically applied the factors of *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975)—a federal attenuation case—to determine whether the taint from a prior illegal seizure had been removed. *State v. Armenta*, 134 Wn.2d 1, 17, 948 P.2d 1280 (1997). We have even remanded application of the federal attenuation doctrine to the trial court[28] and applied the United States Supreme Court's consideration of a fourth factor (whether *Miranda* warnings were given) where applicable.[29]

> 2.  *The history of article I, section 7 confirms that the attenuation doctrine is appropriate in Washington*

¶82 There is limited circumstantial evidence of the intent of the drafters of article I, section 7 (and those who ratified it) "to establish a search and seizure provision that varied from the federal provision." *State v. Simpson*, 95 Wn.2d 170, 178, 622 P.2d 1199 (1980). First of all, the convention proposed and adopted a rule stating that committee proceedings were not to be made public "except as they may be reported by said committees from time to time." THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 55, 73 (Beverly Paulik Rosenow, ed., 1962); *see also* MINUTES OF PROCEEDINGS OF CONSTITUTIONAL CONVENTION 73, 94 (on microfilm with the Washington State Law Library). Second, article I, section 7 passed *without*

---

[28] *See supra* note 19.

[29] *See supra* note 20.

*debate* on July 31, 1889[30] and was even referred to as one of the *"sundry"*[31] amendments made to the initial Bill of Rights read to the Convention on July 11, 1889. MINUTES OF PROCEEDINGS OF CONSTITUTIONAL CONVENTION 216 (on microfilm with the Washington State Law Library). In fact, the only substantial debate over the language submitted by the committee centered on the preamble.

¶83 Clear evidence in support of the framers' intent to apply an exclusionary rule is not found in this history. Contrary to the assertions of an oft-cited secondary source,[32] it is also plausible to posit that article I, section 7's language was merely intended to be a simplification of what is and is not a constitutional search, using then-contemporary language.[33] In contrast, direct evidence proves that this court has a long history of closely following United States Supreme Court precedent with respect to the exclusionary rule, especially the attenuation doctrine.[34]

---

[30] *The Bill of Rights Adopted: The Preamble Was Recommitted — A Long Afternoon's Session*, TACOMA DAILY LEDGER, July 30, 1889, at 4, cols. 3-5, *in* 4 WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889: CONTEMPORARY NEWSPAPER ARTICLES 4-57 (Marian Gallagher Law Library 1998).

[31] WEBSTER'S INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1445 (1899), a publication ordered by Congress, defines "sundry" as (1) several, divers; more than one or two; various; (2) separate, diverse. "Sundries" are defined as "[m]any different or small things; sundry things." *Id.* A "sundryman" is defined as "one who deals in sundries, or a variety of articles." *Id.*

[32] Pitler, *supra*, at 460-61, 520-22.

[33] One of the seven committee members was an editor; two were lawyers. Wilfred J. Airey, A History of the Constitution and Government of Washington Territory 440-42 (June 5, 1945) (unpublished PhD Thesis, University of Washington) (on file with Washington State Law Library); THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, *supra*, at 19. Two of the first justices to sit on the Washington Supreme Court, Justice Stiles and Justice Dunbar, were not on the committee but were members of the Constitutional Convention. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, *supra*, at 199. Both voted for the adoption of article I, section 7. *Id.* In 1905, Justice Dunbar concurred in an opinion rejecting the exclusionary rule. *See infra* note 34.

[34] The exclusionary rule originated in *Boyd*, 116 U.S. 616, just three years prior to the adoption of the Declaration of Rights at the Washington Constitutional Convention. This court, however, rejected the *Boyd* principle in 1905 in *Royce*, 38 Wash. at 116 (Dunbar, J., concurring). Importantly, we note that Justice Dunbar sat as a delegate to the Washington Constitutional Convention and had voted *for*

## C. *Logical Consequences for Washington's Exclusionary Rule*

¶84 Article I, section 7 decrees that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Generally, we have read the phrase "authority of law" to require a warrant, *State v. Morse*, 156 Wn.2d 1, 7, 123 P.3d 832 (2005) (citing *State v. Ladson*, 138 Wn.2d 343, 350, 979 P.2d 833 (1999)), unlike the more easily satisfied reasonableness standard of the federal exclusionary rule. We recognize few exceptions to the article I, section 7 warrant requirement, and those that are recognized are " 'jealously and carefully drawn.' " *Winterstein*, 167 Wn.2d at 628 (internal quotation marks omitted) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996)). It is important to recognize, however, that it is exceptions to the warrant requirement that are " 'jealously and carefully drawn,' " not exceptions to the exclusionary rule such as the attenuation doctrine. *Id.* (internal quotation marks omitted) (quoting *Hendrickson*, 129 Wn.2d at 70; *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980) (citing *Jones v. United States*, 357 U.S. 493, 499, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958))). Consistent with our basic holding in *Eserjose*, we should affirm that the attenuation doctrine is consistent with article I, section 7 and affirm the Court of Appeals.

---

the adoption of article I, section 7. Airey, *supra*, at 440-42; The Journal of the Washington State Constitutional Convention 1889, *supra*, at 199. It was not until 1922 that an exclusionary rule was adopted by this court in *Gibbons*, 118 Wash. 171. This was not done until *after* the United States Supreme Court rearticulated an exclusionary rule in *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), *overruled on other grounds by Mapp*, 367 U.S. 643, and *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920), after it had temporarily returned to the common law rule of nonexclusion in *Adams v. New York*, 192 U.S. 585, 24 S. Ct. 372, 48 L. Ed. 575 (1904). Whether or not *Royce* stands for the proposition that the drafters of article I, section 7 (and those who ratified it, including Justice Dunbar) did not contemplate an exclusionary rule, this court has a long history of closely following United States Supreme Court precedent in this area, both in 1905 (*Royce* being one year after *Adams*), in 1922 (*Gibbons* being two years after *Silverthorne*), and since the 1960s in the wake of *Mapp*.

## II. *The Attenuation Doctrine in Washington State*

¶85 The attenuation doctrine requires us to consider "whether the . . . evidence was [obtained] 'by *exploitation* of [the initial] illegality [*rather than*] by means sufficiently distinguishable to be purged of the primary taint.' " *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984) (emphasis added and omitted) (third alteration in original) (internal quotation marks omitted) (quoting *Wong Sun*, 371 U.S. at 488). The key factor that courts must scrutinize when applying the attenuation doctrine is the causal link between the prior illegality and subsequently discovered evidence. Namely, the evidence is not to be excluded if that link is "so attenuated as to dissipate the taint" of the activity. *Nardone*, 308 U.S. at 341. In applying this test, federal courts utilize a three-part framework that weighs (1) the temporal proximity between the illegal activity and the discovery of the evidence, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct that tainted the case. *See Le*, 103 Wn. App. at 362 (citing *Brown*, 422 U.S. at 603-04). In Washington, as in federal court, we apply these three factors plus a fourth factor where applicable: whether *Miranda* warnings have been given. *See Armenta*, 134 Wn.2d at 17-18.[35]

## III. *The Officers Had Authority of Law to Arrest Ibarra-Cisneros and Seize the Cocaine Bindle*

¶86 The issue squarely before us is whether the police officers who actually met Ibarra-Cisneros, followed him into a public parking lot, and arrested him had the requisite "authority of law" to seize the cocaine bindle found at his feet. *See supra* note 22. As demonstrated by the facts, the police officers *did* have the authority of law necessary to

---

[35] *See also State v. Knighten*, 109 Wn.2d 896, 910-11, 748 P.2d 1118 (1988) (Pearson, C.J., dissenting); *State v. Coyne*, 99 Wn. App. 566, 574, 995 P.2d 78 (2000); *State v. O'Day*, 91 Wn. App. 244, 252-53, 955 P.2d 860 (1998).

arrest Ibarra-Cisneros and seize the cocaine bindle. They had probable cause to arrest and the contraband was in open view.[36] The cocaine bindle is not subject to the exclusionary rule because the exclusionary rule does not apply.

## IV. *The Exclusionary Rule Does Not Apply to the Cocaine Bindle*

¶87 The exclusionary rule does not apply to the seizure of the cocaine bindle because the seizure and Ibarra-Cisneros' arrest is far attenuated from the unlawful search of his brother's residence. A number of significant intervening circumstances separated the illegal seizure of the phone from the discovery of the cocaine bindle in the parking lot.

¶88 First, Ibarra-Cisneros spontaneously called a cell phone; the police did not contact him. *See State v. Gonzales*, 46 Wn. App. 388, 398, 731 P.2d 1101 (1986) ("a *spontaneous* volunteered statement can itself be a significant intervening circumstance, sufficiently attenuated from the original police illegality to allow admission"). Second, Ibarra-Cisneros continued talking to Agent Palacios even after he learned that he was speaking to a stranger. In *State v. Goucher* we held:

> "[The defendant] instituted the calls and spoke voluntarily and without hesitation to the agents. None of the agents pretended to be . . . the party [defendant] wished to reach. [Defendant] had no legitimate expectation of privacy in his telephone conversation with the agents. He assumed the risk of exposure when he spoke freely with strangers."

124 Wn.2d 778, 783, 881 P.2d 210 (1994) (most alterations in original) (quoting *United States v. Congote*, 656 F.2d 971, 976 (5th Cir. 1981)). Third, the cell phone did not belong to

[36] We note here that the record supports a finding that the officers also had the authority of law to conduct a *Terry* stop, and lawfully pat down Ibarra-Cisneros. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Moreover, the bindle of cocaine was not seized or manipulated pursuant to a *Terry* stop, but was found in open view on the ground where Ibarra-Cisneros had been standing. *Cf. Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993).

Ibarra-Cisneros; his standing to contest the search was never raised.

¶89 Fourth, it was Ibarra-Cisneros who asked to meet and confront Agent Palacios. It was also Ibarra-Cisneros, not Agent Palacios, who repeatedly "tripped" Agent Palacios when Ibarra-Cisneros arrived at the Super One Foods parking lot. 1 VRP at 139-40. Given his threat to "put a bullet between [Agent Palacios'] eyes," Ibarra-Cisneros cannot claim he was not ready to face the consequences of such a meeting. *Id.* at 139. Fifth, although Ibarra-Cisneros agreed to meet Agent Palacios, a federal officer, it was not Agent Palacios who eventually went to meet Ibarra-Cisneros—it was local police. The local police were not acting at the direction of Agent Palacios, but were responding, in real-time, to information given to them while they were on-duty. Sixth, the arrest was made several hours after the search of his brother's residence, and the officers were not looking for the cocaine bindle in the first place (it was in open view). Finally, Ibarra-Cisneros was arrested by local police and advised of his *Miranda* rights.

¶90 The cocaine bindle is more than sufficiently attenuated from the unlawful search of the home and the seizure of the phone. In keeping with this court's application of state and Supreme Court precedent, the cocaine bindle was obtained by means sufficiently distinguishable to be purged of the primary taint, rather than by the exploitation of the illegality. *See Segura,* 468 U.S. at 830; *Wong Sun,* 371 U.S. at 488. The totality of the circumstances satisfies this principle and our four-factor test: the seizure of the cocaine bindle was not contemporaneous with the unlawful search,[37] there were

---

[37] *See generally O'Day,* 91 Wn. App. at 252 (no attenuation when illegality was contemporaneous to discovery of evidence); *McReynolds,* 117 Wn. App. at 344. The Court of Appeals in *McReynolds* reasoned that a four-day gap between the issuance of a warrant resulting in an illegal search and issuance of a subsequent search warrant was not sufficient to support attenuation, but also found that a lack of police flagrancy supported the trial court's finding of attenuation. *Id.* at 323 nn.1-2. The *McReynolds* court concluded that "[t]he [trial] court . . . properly evaluated the relevant factors and concluded that some of the material [support-

many intervening circumstances (as listed above), the purpose of the police officers was to enforce the law, and the police officers exhibited proper behavior from start to finish, including their conduct at the Super One Foods parking lot and the Blue Mountain Mall. Finally, *Miranda* warnings were given. The local police officers in this case were not attempting to elicit an incriminating response from Ibarra-Cisneros.[38] They were responding to crime and preserving the peace. In sum, the Court of Appeals should be affirmed.[39]

## CONCLUSION

¶91 The majority states "the only fair resolution of Ibarra-Cisneros's appeal is to treat it as the Court of Appeals treated Ibarra-Raya's appeal [and reverse the conviction]." Majority at 885. This is not fair and surely not constitutionally required. Clear evidence supports the jury's verdict to convict Gilberto Ibarra-Cisneros of possession of a controlled substance. The seized cocaine bindle in a public place is more than sufficiently attenuated from the unlawful search of Ibarra-Raya's home and cell phone, occurring far in time and in distance from that search. The attenuation doctrine is consistent with article I, section 7 of the Washington State Constitution, and the jury that heard the evidence properly convicted Ibarra-Cisneros of possession of a controlled substance. I dissent.

---

ing the warrant] was not tainted," reversed the conviction but remanded for reconsideration of the attenuation issue. *See id.* at 324.

[38] *See State v. Walton*, 67 Wn. App. 127, 130-31, 834 P.2d 624 (1992) (stating a general prohibition against police officers eliciting incriminating responses through deceptive means (citing *State v. Hensler*, 109 Wn.2d 357, 362, 745 P.2d 34 (1987))).

[39] "Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004) (citing *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).